FILED
U.S. DISTRICT COURT

2006 MAY 31  P 3: 50

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

James S. Jardine (1647)
Rick B Hoggard (5088)
RAY QUINNEY & NEBEKER, P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
    Telephone: (801) 532-1500

Attorneys for Defendant e.Digital Corporation

---

## IN THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| DIGECOR, INC., a Washington corporation, | **NOTICE OF REMOVAL** |
| Plaintiff, | |
| v. | **Judge Ted Stewart**<br>**DECK TYPE: Civil**<br>**DATE STAMP: 05/31/2006 @ 15:50:49**<br>**CASE NUMBER:  2:06CV00437  TS** |
| E.DIGITAL CORPORATION, a Delaware corporation; DOES 1 to 20, individuals; | |
| Defendants. | |

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441, the Defendant e.Digitial

Corporation ("e.Digital") hereby removes this action, currently pending in the Third Judicial

District Court, County of Salt Lake, State of Utah, Case No. 060907406, before the Honorable

Timothy R. Hanson, to the United States District Court for the District of Utah, Central Division.

This Court has original jurisdiction of this dispute under 28 U.S.C. § 1332 because there is

complete diversity of citizenship between the Plaintiff, digEcor Corporation, a Utah corporation

with its principal place of business in Springville, Utah, and the only Defendant named and

served in this action, e.Digital, a Delaware corporation with its principal place of business in San

Diego, California.[1]  The matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs as alleged by the Plaintiff.  This notice of removal is filed within thirty days

after e.Digital's receipt of the Complaint on May 8, 2006, which Complaint was filed on May 4,

2006.  All process, pleadings and orders served upon e.Digital in this matter are attached hereto.

DATED this 31st day of May, 2006.

RAY QUINNEY & NEBEKER, P.C.

James S. Jardine
Rick B Hoggard

Attorneys for Defendant e.Digital Corporation

---

[1] Pursuant to 28 U.S.C. §§ 1441(a) and (b), the Court ignores parties sued under "fictitious names," such as the John
Does 1-20, as well as any defendants not served.  Under these rules, e.Digital is the only defendant named and, to
the best of e.Digital's knowledge, the only defendant served in this action.

**Certificate of Service**

A true and correct copy of the foregoing Notice of Removal and accompanying attachments was served on the following by hand delivery on this 31st day of May, 2006:

> David W. Tufts
> DURHAM JONES & PINEGAR
> 111 E. Broadway, Suite 900
> Salt Lake City, Utah 84111
>
> Attorneys for Plaintiff

877217

# EXHIBIT A

James S. Jardine (1647)
Rick B Hoggard (5088)
RAY QUINNEY & NEBEKER, P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
    Telephone: (801) 532-1500

Attorneys for Defendant e.Digital Corporation

---

## IN THE THIRD JUDICIAL DISTRICT COURT, COUNTY OF SALT LAKE
## STATE OF UTAH

| | |
|---|---|
| DIGECOR, INC., a Washington corporation, | NOTICE OF FILING NOTICE OF REMOVAL |
|          Plaintiff, | |
| v. | Civil Case No. 060907406 |
| E.DIGITAL CORPORATION, a Delaware corporation; DOES 1 to 20, individuals; | Judge Timothy R. Hanson |
|          Defendants. | |

**TO THE ABOVE-NAMED PLAINTIFF AND ITS COUNSEL OF RECORD:**

Please take notice that on this day, a Notice of Removal of the above-entitled action

was filed in the United States District Court for the District of Utah on behalf of Defendant

e.Digital Corporation), as this action is between citizens of different states and, upon

information and belief, the amount in controversy exceeds $75,000.00. The filing of the

Notice of Removal in the United States District Court and this notice in state court effects the

removal of this action from state court. No further proceedings in this action before the state

court are allowed unless and until the action is remanded by the United States District Court.

A copy of the Notice of Removal filed in the United States District Court is attached hereto as Exhibit A.

DATED this 31st day of May, 2006.

RAY QUINNEY & NEBEKER, P.C.

James S. Jardine
Rick B. Hoggard
Attorneys for Defendant e.Digital Corporation

## Certificate of Service

A true and correct copy of the foregoing Notice of Filing Notice of Removal and accompanying attachments were served on the following by hand delivery on this 31st day of May, 2006:

> David W. Tufts
> DURHAM JONES & PINEGAR
> 111 E. Broadway, Suite 900
> Salt Lake City, Utah 84111
>
> Attorneys for Plaintiff

877454

**DURHAM JONES & PINEGAR**
David W. Tufts (8736)
111 E. Broadway, Suite 900
Salt Lake City, Utah 84111
(801) 415-3000
(801) 415-3500 fax

Attorneys for Plaintiff digEcor, Inc.

## IN THE THIRD JUDICIAL DISTRICT COURT, COUNTY OF SALT LAKE

## STATE OF UTAH

| | |
|---|---|
| DIGECOR, INC., a Washington corporation,<br><br>Plaintiff<br><br>vs.<br><br>E.DIGITAL CORPORATION, a Delaware corporation; DOES 1 to 20, individuals;<br><br>Defendants. | **SUMMONS TO E.DIGITAL CORPORATION**<br><br>Case No. 060907406<br><br>Hon. Timothy R. Hanson |

THE STATE OF UTAH TO THE ABOVE NAMED DEFENDANT:

      E.DIGITAL CORPORATION
      c/o Harvard Business Services, Inc.
      16192 Coastal Highway
      Lewes, Delaware 19958

      You are hereby summoned and required to file with the Clerk of the above-entitled court,

at 450 South State Street, P.O. Box 1860, Salt Lake City, Utah 84114-1860, an answer in

writing to the attached Complaint, and to serve upon, or mail to David W. Tufts of Durham Jones

& Pinegar, 111 East Broadway, Suite 900, P. O. Box 4050, Salt Lake City, UT 84110-4050, a

copy of your answer, within thirty (30) days after service of this summons upon you. If you fail

1

to do so, judgment by default will be taken against you for the relief demanded in said complaint

which has been filed with the clerk of said court and a copy of which is hereto annexed and

herewith served upon you.

May 5, 2006                    **DURHAM JONES & PINEGAR**

David W. Tufts
Attorneys for digEcor, Inc.

**DURHAM JONES & PINEGAR**
David W. Tufts (8736)
111 E. Broadway, Suite 900
Salt Lake City, Utah  84111
(801) 415-3000
(801) 415-3500 fax

Attorneys for Plaintiff digEcor, Inc.

**FILED DISTRICT COURT**
Third Judicial District

MAY 0 4 2006

By _____
SALT LAKE COUNTY

Deputy Clerk

## IN THE THIRD JUDICIAL DISTRICT COURT, COUNTY OF SALT LAKE

## STATE OF UTAH

| | |
|---|---|
| DIGECOR, INC., a Washington corporation,<br><br>Plaintiff<br><br>vs.<br><br>E.DIGITAL CORPORATION, a Delaware corporation; DOES 1 to 20, individuals;<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 060907406<br><br>Hon. HANSON |

Plaintiff hereby complains of defendants as follows:

### PARTIES AND JURISDICTION

1.     Plaintiff digEcor, Inc. ("digEcor") is a Washington corporation.  digEcor's

principal place of business is located at 1625 North 1100 West, Springville, Utah  84663.

digEcor was formerly known as Aircraft Protective Systems, Inc. ("APS").

2.     Defendant e.Digital Corporation ("e.Digital") is a Delaware corporation.

e.Digital's principal place of business is located at 13114 Evening Creek Drive South, San

Diego, California  92128.

1

3.     Alfred H. Falk is an individual who has served as an officer and agent of e.Digital. Mr. Falk has participated directly in the acts complained of herein.

4.     William Blakeley is an individual who has served as an officer and agent of e.Digital. Mr. Blakeley has participated directly in the acts complained of herein.

5.     Robert Putnam is an individual who has served as an officer and agent of e.Digital. Mr. Putnam has orchestrated and participated in the acts complained of herein.

6.     digEcor does not know the name or identity of defendants Does 1 thru 20. Pursuant to Rule 9(a)(2), digEcor sues these unknown defendants under fictitious names. digEcor will amend its complaint to include the true name of these defendants when the identity of these defendants is ascertained.

7.     digEcor is informed and believes, and on that basis alleges, that at all relevant times the above-named defendant, including the Doe defendants, were acting in concert as agents for each other as they perpetrated the acts complained of herein.

8.     digEcor is a substantial customer of e.Digital. In the Form 10-Q that e.Digital filed with the United States Securities and Exchange Commission for the quarterly period ended December 31, 2005 (Commission File Number 0-20734), e.Digital reported that its "[s]ales to one customer [digEcor] comprised 99% and 98% of revenue for the nine months ended December 31, 2005 and 2004, respectively."

9.     On more than one occasion, representatives of e.Digital have traveled to Utah where they have met with representatives of digEcor at digEcor's offices in Springville, Utah, to engage in discussions designed to further the business relationship between e.Digital and digEcor.

2

10.    e.Digital, Mr. Falk, Mr. Blakeley, Mr. Putnam and others acting on behalf of defendants, have directed numerous correspondences to digEcor at its offices located in Springville, Utah, the purpose of which was to engage in business with digEcor and further the business relationship of e.Digital and digEcor.

11.    As explained more particularly below, the defendants have engaged in the transaction of business in this State by entering into contracts with digEcor to supply services and goods to digEcor in this State.

12.    The Terms and Conditions of the contract between digEcor and e.Digital provides:

> VENUE SELECTION/CHOICE OF LAW This agreement shall be deemed to have been made in the State of Utah, U.S.A. and shall be interpreted in accordance with the law of the State of Utah without regard to conflict of law principles. Seller consents to the exclusive jurisdiction of the state and federal courts of the state of Utah, U.S.A., for determination of any claim or controversy between the parties and arising out of or relating to these terms and conditions of purchase.

Terms and Conditions of Purchase, p. 2.

13.    Based on their contacts with digEcor and others in Utah (and the fact that 99% of e.Digital revenue is derived from the State of Utah), the defendants have availed themselves of this forum and should reasonably expect that they will be hailed into the Courts of the State of Utah if a dispute arises between them and digEcor.

14.    For these reasons, this Court has jurisdiction over the defendants pursuant to Utah Code Ann. § 78-27-24.

15.    In addition, this Court should assert jurisdiction over the defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment of the United States

Constitution, pursuant to Utah Code Ann. § 78-27-22, which would allow this Court to exercise jurisdiction over the defendants in this matter.

## GENERAL ALLEGATIONS

16.     On October 31, 2005, digEcor issued a Purchase Order number CJ5LY9RCW to e.Digital. A copy of this Purchase Order and the terms and conditions of the order are attached as **Exhibit A**.

17.     The Purchase Order requires e.Digital to ship to digEcor on January 10, 2006, 1,250 units of a portable digital entertainment device called the "digEplayer" and an equal number of li-ion batteries for each of the players. The digEplayer was priced at $571.00 per unit (which includes an amount for licensing and manufacturing supervision fees); each battery was priced at $64.00 per unit. The Purchase Order specifies that the payment schedule will be 25% down with order, 25% paid 30 days prior to shipment, and 50% paid at the time of shipment.

18.     The Purchase Order also includes an order for an additional 750 digEplayers and batteries to be delivered at an unspecified future time to be designated by digEcor.

19.     The Purchase Order provides that it is contingent upon digEcor and e.Digital reaching an agreement on terms for digital rights management ("DRM") between the parties. This contingency was satisfied on November 11, 2005.

20.     On November 11, 2005, e.Digital signed the Purchase Order and entered into a separate document entitled "Digital Rights Management Engineering Program Services Agreement" (the "DRM Agreement"). A copy of the DRM Agreement signed by Robert Putnam for e.Digital is attached as **Exhibit B**.

21.     The parties entered into the DRM Agreement to satisfy the contingency stated on the Purchase Order. The DRM Agreement makes an express reference to the Purchase Order,

4

confirming that digEcor has placed an order with e.Digital for the 1,250 units to be delivered "immediately." DRM Agreement, ¶ 5.

22.    The DRM Agreement provides that: "Time is of the essence. Delivery commitments by EDIGITAL to DIGECOR are contained in this Agreement." DRM Agreement, ¶ 12(b).

23.    The DRM Agreement requires e.Digital to create and adapt certain software technology for digEcor to use on the digEplayers. This software was to be designed to protect and manage the multi-media content on the digEplayers.

24.    The DRM Agreement provides: "DIGECOR will pay EDIGITAL a $25,000 one-time flat fee for an unrestricted, unlimited, irrevocable right to use the DRM technology for use on the DIGECOR digEplayer and other DIGECOR products, including the right to modify and add to the DRM technology at DIGECOR's discretion." DRM Agreement, ¶ 2. This right to use the DRM technology is exclusive to digEcor for the aircraft industry and non-exclusive for all other markets. DRM Agreement, ¶ 2. digEcor offered payment of this $25,000 flat-fee, but e.Digital has repudiated its express obligations under the DRM Agreement and has refused to accept payment in accordance with the DRM Agreement.

25.    On November 15, 2005, digEcor paid e.Digital the sum of $198,437.50 representing the "25% down with order" specified in the Purchase Order. At the time of this payment, e.Digital represented to digEcor that it had the capacity and intent to perform the terms of the Purchase Order by delivering the 1,250 units and batteries on or before January 10, 2006. digEcor believed that these representations were true and relied on them in making this payment.

26.    On December 9, 2005, digEcor paid e.Digital the sum of $198,437.50 representing the "25% [due] 30 days prior to shipment." At the time of this payment, e.Digital

again represented to digEcor that it intended to perform the terms of the Purchase Order by delivering the 1,250 units and batteries on or before January 10, 2006. digEcor believed that these representations were true and relied on them in making this payment. Unfortunately, these representations made by e.Digital were not true when made, and e.Digital knew or should have known that they were not true.

27.     On December 23, 2005, digEcor paid $100,000 as a prepayment of a portion of the remaining balance that was not yet due under the Purchase Order. Fred Falk of e.Digital requested that digEcor make this payment early and in so doing represented to digEcor that the construction and delivery of the 1,250 units was on track and on schedule. digEcor relied on Mr. Falk's representations when it made this payment. Unknown to digEcor, Mr. Falk's representations were not true when made. Mr. Falk and other persons at e.Digital knew or should have known that these representations were not true and should have disclosed this to digEcor.

28.     On January 10, 2006, digEcor paid e.Digital the sum of $233,625.00 as full and final payment of the amount due under the Purchase Order, net of $13,250 (that was an offset for sums owing from e.Digital to digEcor) and $50,000. digEcor made this final payment because e.Digital represented that the units were ready to be shipped. digEcor relied on this representation, not knowing that it was false. The $13,250 was withheld to offset for warranty claims that e.Digital owed to digEcor. The $50,000 was reserved to cover the costs of the shells that would be used for the units. The withholding of the cost to buy the shells is standard in the industry and was agreed upon between these parties.

29.     e.Digital has breached the terms of the Purchase Order and DRM Agreement by failing to deliver the 1,250 units due on January 10, 2006.

30.     On March 6, 2006, when digEcor advised e.Digital that the digEplayers needed to be enclosed in their plastic shells and shipped, e.Digital complained to digEcor about the $13,250 and $50,000 offset that digEcor rightfully withheld on January 10, 2006.   In reliance on e.Digital's representations that if digEcor would pay these amounts if it would deliver the product, digEcor paid (under protest) the $13,250 and $50,000 to e.Digital.  The $50,000 was paid by digEcor directly to Maycom, e.Digital's contract manufacturer, at e.Digital's direction and insistence.

31.     e.Digital still did not deliver the 1,250 units required under the Purchase Order. As of this date e.Digital refuses to provide any firm delivery date for these units.

32.     e.Digital has acknowledged that it is in breach of the terms of the Purchase Order and DRM Agreement.  In the Form 8-K that e.Digital released to the public on March 23, 2006, it explained that its subcontractor, Maycom, has not provided the units to e.Digital and as a result of this "we [e.Digital] are unable to deliver product to our customer, digEcor, in a timely manner."  As such, e.Digital explains:

> We have approximately $600,000 in deposits to Maycom as a
> current asset and approximately $790,000 of deposits from digEcor
> as a current liability related to the digEplayers associated with this
> order.  Our deposits with Maycom may be impaired and we could
> be obligated to digEcor for their deposits to us if product is not
> delivered.

A copy of the relevant portion of this Form 8-K is attached as **Exhibit C**.  e.Digital also released a press release that said the same thing.  A copy of this press release is attached as **Exhibit D**.

33.     e.Digital has not acted in good faith with respect to the delivery of the 1,250 units required by the Purchase Order.  At the same time e.Digital was falsely representing to digEcor that it could not produce the 1,250 units required under its contact, e.Digital was accepting orders to deliver the same or a substantially similar unit directly to others.  On March 30, 2006,

e.Digital circulated a press release saying that "today [e.Digital] announced it has begun receiving orders of its new proprietary eVU portable entertainment product from companies in the healthcare and travel and leisure industries." A copy of this press release is attached as **Exhibit E**. The eVU is very similar to the digEplayer.

34.     These orders that e.Digital acknowledges accepting for digEcor's product are the result of an active campaign by e.Digital to harm digEcor by selling digEcor's product directly to digEcor's customers and potential customers. digEcor is informed and believes that Mr. Blakeley and others have been soliciting digEcor's customers and potential customers in the airline industry. In these solicitations Mr. Blakeley touts the digEplayer as an e.Digital product, saying that "more than 25 Airlines use our OEM digEplayer 5500TM* which is offered through Wencor/digEcor." By these solicitations e.Digital has been actively attempting to trade off the goodwill that digEcor has generated with its products by offering to sell e.Digital's rebranded player, the eVU, directly to the airline industry.

35.     These acts of soliciting customers in the airline industry and contracting to sell the eVU for in flight entertainment in that industry is a breach of the DRM Agreement's exclusive license for digEcor to use e.Digital's technology in the aircraft industry. This also constitutes a breach of the covenant of good faith and fair dealing that is inherent in the Purchase Order, DRM Agreement, and the parties other contracts, and it is an intentional interference with digEcor's prospective economic relationships.

36.     In addition to e.Digital's breaches of the Purchase Order and DRM Agreement, and its breaches of the covenant of good faith and fair dealing, its act of competing directly with digEcor is a breach of an express contract entitled the Nondisclosure Agreement. On April 2, 2002, when digEcor (under the name Aircraft Protective Systems, Inc. or APS, Inc.) first

contacted e.Digital to explore the possibility of entering into a long term business relationship, the parties entered into a contract wherein e.Digital promised that it would not compete with APS, Inc. and would refrain from manufacturing and/or selling any like or similar components for at least 7 years.  A copy of this Nondisclosure Agreement is attached as **Exhibit F**.

37.     On October 22, 2002, e.Digital entered into another contract with digEcor (under the name APS, Inc.) whereby e.Digital contracted to develop and manufacture a "portable video device" for APS/digEcor to market in the airline industry.  This contract is entitled the "Agreement."  A copy of the Agreement is attached as **Exhibit G**.  It was pursuant to this Agreement that e.Digital designed and produced the first digEplayer for APS/digEcor.  In addition to the manufacturing management fees and the warranty fees charged by e.Digital against APS/digEcor, APS/digEcor paid in excess of $200,000.00 for e.Digital's original design work.  APS/digEcor accepted this design and has successfully marketed it to a broad range of customers in the airline industry.  APS/digEcor has invested hundreds of thousands of dollars in this marketing effort.  The Agreement contemplates that digEcor will have an irrevocable and exclusive right to market the digEplayer without interference from e.Digital.  The Agreement states that e.Digital can only obtain the right to market the device if APS/digEcor elects not proceed with the production of this device.

38.     e.Digital's act of marketing a device (the eVU) that is derived from the design of the digEplayer constitutes a breach of the Agreement, and a breach of the covenant of good faith and fair dealing that is implied in the Agreement, because by this act e.Digital is subverting the very purpose of the Agreement.

39.     On March 31, 2006, e.Digital released another press release regarding its breach of the Purchase Order and DRM Agreement.  In this press release e.Digital confirms that it has

9

not yet established a definitive plan or timetable for the delivery of the 1,250 units.  A copy of this press release is attached as **Exhibit H.**

## FIRST CLAIM FOR RELIEF

(Breaches of Contract – against e.Digital)

40.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

41.     e.Digital has breached its contracts with digEcor by failing to deliver the 1,250 units and batteries on the date that they were due, as well as failing to make available and then deliver the follow-on order of 750 units.

42.     e.Digital has breached its contracts with digEcor by failing to honor the exclusive license that it granted to digEcor, a provision that was specifically negotiated by the Parties.

43.     e.Digital has breached its contracts by failing to honor the warranty it gave for the digEplayer product.

44.     e.Digital has breached its contracts by refusing to honor the terms of the DRM Agreement to supply the DRM technology for a flat fee of $25,000 and other good and valuable consideration, such as the approval of the DRM technology at Motion Picture Studios by the efforts of digEcor.

45.     e.Digital has breached its contracts by wrongfully repudiating digEcor's exclusive rights to use of property to which digEcor has a right of use.

46.     digEcor has substantially performed all material obligations under its contracts.

47.     digEcor has suffered actual damages by e.Digital's breaches of these contracts in an amount that will be proven at trial, but that is not less than $793,750.  digEcor has also

suffered consequential damages in an amount to be proved at trial, but which is not less than an additional $1,000,000.00

## SECOND CLAIM FOR RELIEF

(Alternative Claim for Unjust Enrichment – against e.Digital)

48.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

49.     If the Court finds that the parties do not have a contract, or otherwise refuses to grant the relief requested in digEcor's first claim for relief, digEcor asserts this claim as an alternative to its first claim for relief.

50.     e.Digital has been unjustly enriched by receiving $793,750 from digEcor for product that e.Digital has never delivered to digEcor.

51.     digEcor unwittingly conferred this benefit on e.Digital.

52.     e.Digital was and is aware of the benefit that digEcor has conferred upon it.

53.     It is inequitable for e.Digital to retain this benefit that digEcor has conferred upon it without payment of its value.

54.     digEcor is entitled to a judgment against e.Digital in an amount sufficient to compensate it for the benefit that the e.Digital has unjustly retained.

## THIRD CLAIM FOR RELIEF

(Breach of the Covenant of Good Faith and Fair Dealing – against e.Digital)

55.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

56.     With respect to the contracts described above, there was and is an implied covenant of good faith and fair dealing.

11

57.   By reason of its acts, conduct and omissions, e.Digital has breached its implied covenant of good faith and fair dealing.

58.   digEcor has been damaged by e.Digital's breaches of the implied covenant of good faith and fair dealing.

59.   digEcor is entitled to damages against e.Digital for its breaches of the implied covenant of good faith and fair dealing in the amount of not less than $790,750 plus the damage of loss of business and consequential damages that digEcor has suffered, in an amount that will be proved at trial.

## FOURTH CLAIM FOR RELIEF

(Fraud – against all defendants)

60.   digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

61.   Defendants made representations, as those representations are more particularly described above, concerning presently existing material facts which were false.

62.   Defendants made these representations directly to digEcor.

63.   Defendants made these representations knowing that they were false.

64.   Defendants made these representations for the purpose of inducing digEcor to act upon them by making payments to e.Digital.

65.   In addition to Defendants' affirmative misrepresentations, Defendants failed to disclose to digEcor material facts which it knew, or should have known, would negatively influence digEcor's decision to make payments to e.Digital.

66.   digEcor, acting reasonably and in ignorance of the falsity of Defendants' representations, and in ignorance of material facts that Defendants should have disclosed, did in

12

fact rely on his representations and omissions and was induced thereby to make payments to e.Digital.

67.    As a result of Defendants' acts, digEcor has been injured and suffered actual damages in an amount not less than $793,750, or such higher amount as will be proved at trial.

## FIFTH CLAIM FOR RELIEF

### (Negligent Misrepresentation – against all defendants)

68.    digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

69.    If the representations made by Defendants to digEcor as described above are found to have not been fraudulently made, digEcor alleges, in the alternative, that Defendants made those representations with negligent disregard for their truth or falsity.

70.    The representations made by Defendants to digEcor were negligent misrepresentations of material facts.

71.    digEcor reasonably relied on Defendants' representations.

72.    Defendants had a pecuniary interest in making these misrepresentations to digEcor.

73.    Defendants were in a superior position to know the material facts about which it made misrepresentations.

74.    Defendants should have reasonably foreseen that digEcor was likely to rely upon its representations.

75.    digEcor did rely on Defendants' negligent misrepresentations.

76.    As a result of Defendants' acts, digEcor has been injured and suffered actual damages in an amount not less than $793,750, or such higher amount as will be proved at trial.

## SIXTH CLAIM FOR RELIEF

(Intentional Interference with Prospective Economic Relations – against all defendants)

77.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

78.     Defendants have intentionally interfered with digEcor's existing and potential economic relations with its customers and potential customers for purchase of the digEplayer.

79.     Defendants did so for an improper purpose and by improper means.

80.     This interference has caused and is causing injury to digEcor.

81.     DigEcor is entitled to a judgment for all of the damages it has suffered as a result of this interference, in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF

(Punitive Damages – against all defendants)

82.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

83.     Defendants' actions are the result of willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

84.     Pursuant to Utah Code Ann. § 78-18-1, digEcor is entitled to a judgment of punitive damages in an amount to be proved at trial, but which shall not be less than three times the amount of compensatory and general damages awarded at trial.

## EIGHTH CLAIM FOR RELIEF

(Injunction – against all defendants)

85.     digEcor incorporates the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

86.     digEcor is entitled to a temporary restraining order, preliminary, and permanent injunction pursuant to Rule 65A, Utah Rules of Civil Procedure, requiring e.Digital and the other defendants to refrain from selling or licensing the DRM technology to any other party besides digEcor and refrain from using its DRM technology in business in the aircraft industry in competition with digEcor, and from engaging in any competition with digEcor until after 2009.

87.     digEcor will suffer irreparable harm unless the injunction issues.

88.     The threatened injury to digEcor outweighs any injury to e.Digital or the other defendants.

89.     There is a substantial likelihood that digEcor will succeed on the merits of its underlying breach of contract claims or, at minimum, this is a serious issue that is worthy of further litigation.

90.     Issuance of an injunction will not be adverse to the public interest.

## PRAYER FOR RELIEF

WHEREFORE, digEcor prays for judgment against the defendants, and each of them, jointly and severally, as follows:

1.     For actual damages in an amount that will be proven at trial, but that is not less than $793,750; and for consequential damages in an amount that will be proven at trial and that is not less than an additional $1,000,000.00.

2.      For prejudgment and post judgment interest thereon at the maximum rates allowed by law;

3.      For the costs and attorneys' fees incurred herein;

4.      For an award of punitive damages in an amount to be proved at trial, but which should not be less than three times the amount of compensatory and general damages awarded at trial, pursuant to Utah Code Ann. § 78-18-1.

5.      For a temporary restraining order, preliminary, and permanent injunction pursuant to Rule 65A, Utah Rules of Civil Procedure, requiring e.Digital to refrain from selling its DRM technology in business in the aircraft industry in competition with digEcor, and from engaging in any competition with digEcor until after 2009.

6.      For such other and further relief as the Court deems to be just and proper.

May 4, 2006                    **DURHAM JONES & PINEGAR**


_____
David W. Tufts
Attorneys for digEcor, Inc.

digEcor, Inc.
1625 North 1100 West
Springville, Utah  84663

**EXHIBIT A**

# digEcor, Inc.

182E N. 1100 W.
Springville, Ut. 84663-0584
Phone: (801)489-2000          Fax: (801)489-2175
RESALE NO:                    Site: SLCWEXD
Buyer: Julia Tumanuvao
Phone: (801)489-2015   Fax: (801)489-2175

## Purchase Order Number

## CJ5LY9RCW

THIS NUMBER MUST APPEAR ON ALL DOCUMENTS

Order Date: 10/31/2005

**PAGE: 1**

SHIP TO:
digEcor, Inc.
1535 N. 1100 W.
South BLDG. West Dock 2 & 3
Springville, UT 84663-0584
Phone: (801)489-2000      Fax: (801)489-2175
BILL TO:
digEcor, Inc.
P.O. BOX 584
Springville, Ut. 84663-0584
Phone: (801)489-2000      Fax: (801)489-2175

Supplier:

E.DIGITAL CORPORATION
13114 EVENING CREEK DRIV

SAN DIEGO , CA 92128
Attn: FRED FALK

Phone:   858-679-3104
Fax:     858-748-6894
F.O.B.:  ORIGIN
Terms:   N30
Ship Via: FEDX XS

| Line | Part Number / Description | UofM | Ship Date | Quantity | Unit Price | Extension |
|---|---|---|---|---|---|---|
| 1 | DP5500-40E<br>DIGEPLAYER ETHERNET CONFI<br>DESIGN CASE: ZZZZZ   REVISION:   CONDITION: NE | EA | 1/10/2006 | 1,250 | 571.00000 | 713,750.00 |
| | Payment schedule shall be 25% down with order, 25% 30 days prior to shipment; 50% at time of shipment. | | | | | |
| 2 | DP5500-40E<br>DIGEPLAYER ETHERNET CONFI<br>DESIGN CASE: ZZZZZ   REVISION:   CONDITION: NE | EA | 99/99/9999 | 750 | 571.00000 | 428,250.00 |
| 3 | SH-202S-7200<br>LI-ION BATTERY, 7200MAH<br>DESIGN CASE: ZZZZZ   REVISION:   CONDITION: NE | EA | 1/10/2006 | 1,250 | 64.00000 | 80,000.00 |
| | Payment schedule shall be 25% down with order, 25% 30 days prior to shipment; 50% at time of shipment. | | | | | |
| 4 | SH-202S-7200<br>LI-ION BATTERY, 7200MAH<br>DESIGN CASE: ZZZZZ   REVISION:   CONDITION: NE | EA | 99/99/9999 | 750 | 64.00000 | 48,000.00 |

**Purchase Order Total    1,270,000.00**

PLEASE SIGN & FAX TO CONFIRM PRICES AND DELIVERY DATES LISTED ABOVE.
DATE: 11-11-05
SIGNATURE: _____

ORDER IS CONTINGENT ON REACHING AN AGREEMENT ON DRM TERMS.

TOTAL P.01

# WENCOR TERMS & CONDITIONS OF PURCHASE
**QAS 310-4, rev A**

**APPLICABILITY** These terms and conditions of purchase and the separate Wencor Purchase Order Requirements are applicable to purchases made by Wencor West, Inc., and its subsidiaries, including Dixie Aerospace, Inc., Durham Aircraft Service, Inc., Optimum Engineering & Manufacturing, Inc. and Aircraft Protective Systems, Inc. (hereinafter "Wencor") from its vendors and/or suppliers (hereinafter "Seller").

**ACCEPTANCE AND ACKNOWLEDGEMENT** Any performance on a purchase order (hereinafter "P.O.") is deemed an acceptance, without exception, of the terms and conditions set forth on the face of the purchase order and in these terms and conditions of purchase.

**CHANGES** Wencor may at any time make changes within the general scope of the P.O. and Seller shall comply therewith. Except as expressly provided for elsewhere, Wencor and Seller agree that there shall be no adjustment in unit price or delivery schedule without a written change order to the P.O.

**INVOICES** Seller will send a separate invoice and shipping notice for each shipment. Each invoice must show the Wencor P.O. number, part number(s), unit price(s), and quantities shipped. No charges shall be allowed for boxing, crating, packaging, or any other handling unless provisions are agreed to in writing. Delays in receiving invoice, errors or omissions on invoice, or lack of supporting documentation required by the terms of the order will be cause for withholding settlement without losing discount privilege.

**PACKING** No charges shall be allowed for boxing, crating, packaging, or any other handling unless such provisions are agreed to in writing. All goods must be packed appropriately to arrive at destination without damage or as otherwise noted on the P.O.

**RECEIVING INSPECTION** All goods will be received by Wencor subject to inspection, test, and rejection. If goods received are in non-conformance to specifications, drawings, or P.O., at Wencor's discretion goods may be (1) returned at Seller's expense and all delivery charges paid by Wencor will be refunded by Seller, (2) corrected, or (3) replaced at Seller's expense, including transportation both ways. This clause shall not affect any of the rights or liabilities of the parties under the WARRANTY clause. The aforesaid in no way relieves the Seller of its responsibility to inspect and verify that goods in every way meet P.O., print, and specification requirements.

**WARRANTY** Seller warrants that all goods delivered under the P.O. will be merchantable, free from defect in materials and workmanship, and will conform to applicable specifications and drawings. If Seller is responsible for design, Seller warrants that all goods delivered under the P.O. will be free from defective design and will be fit and sufficient for all purposes for which it is designed. Wencor's approval of designs furnished by Seller shall not relieve Seller of obligations under this warranty. Seller's warranties shall pass on to Wencor and its customers. Without prejudice to any other remedy that Wencor may have, Seller shall be responsible for, and bear the expense of, any necessary correction due to faulty workmanship or materials, or due to faulty design unless such design was supplied by Wencor. Seller further warrants that all aircraft materials and/or components shall be furnished in compliance with all applicable Federal Aviation regulations. All inspection records will be made available to Wencor upon request. Seller further warrants that all goods supplied or services performed shall be in accordance with all applicable federal, state, and local laws including environmental protection and occupational safety and health.

**DELIVERY** Shipments shall be made as specified and strictly in accordance with the delivery schedule of the P.O. All orders must be shipped via FedEx on Wencor's FedEx account, unless otherwise specified by Wencor. If the Seller's deliveries fail to meet the schedule, Seller will pay the difference between the shipping method specified in the P.O. and the premium transportation rates. In the event that Seller is unable to make delivery by the date required on the purchase order, Wencor reserves the right to cancel or modify the P.O.

**INDEMNIFICATION** Seller shall indemnify and hold harmless Wencor against any and all claims for U.S. or foreign patent, copyright, trademark, or other proprietary rights infringement. Seller shall defend at Seller's expense any and all infringement suits or actions of law or in equity brought against Wencor and shall satisfy all judgments entered therein.

**TAXES** Seller agrees to pay any taxes imposed by law on account of the goods purchased hereunder.

**NON-DISCRIMINATION & FAIR LABOR STANDARDS ACT** Seller hereby certifies that all goods sold hereunder which are produced or manufactured in the United States are produced in compliance with all applicable requirements, orders and regulations of the United States Federal Government pertaining to nondiscrimination in employment and facilities including, but without limitation

to, the provisions contained in paragraphs one through seven of Part II, Nondiscrimination in Employment by Government Contractors and Subcontractors, of Executive Order 11246 (as amended by Executive Order 11375), Certification of Nonsegregated Facilities (41 CFR Chap.1, Section 1-12. 803-10), the Equal Opportunity and Affirmative Action clauses as required by 41 CFR 60-1.4 (f) (7),60-250.4(m) and 60-741.4(f), and the Fair Labor Standards Act of 1938 as amended (29 U.S. Code 201-219), all of which provisions are incorporated herein by reference and expressly made a part hereof. Seller also certifies full compliance with all state and local laws and orders relating to nondiscrimination in employment and facilities that are applicable to Seller.

**RIGHTS AND RESERVATION** Rights to all drawings, designs, information, tools, and other items supplied by Wencor are reserved and the same shall not be used or reproduced for any purpose whatsoever except for the performance of work under the P.O.

**DEFAULT** (a) Wencor may, subject to provisions of paragraph (c) below, cancel in whole, or in part, the P.O. under any one of the following circumstances: (i) if Seller fails to make delivery of the goods or perform the services within the time specified herein or any agreed upon extension thereof; (ii) if Seller fails to perform any of the other provisions of the P.O., or fails to make progress so as to endanger performance of the P.O. in accordance with its terms; (iii) if in either of these two circumstances, failure to cure within a period of ten (10) days (or such longer period as Wencor may authorize in writing) after receipt of notice from Wencor specifying such failure, as indicated in (i) or (ii) above. (b) In the event Wencor cancels the P.O. in whole or part provided in paragraph (a) of this clause, Wencor may procure upon such terms and in such a manner as Wencor may deem appropriate, goods or services similar to those so canceled, and Seller shall be liable to Wencor for any extra costs for such similar goods or services provided that Seller shall continue performance of the P.O. to the extent not canceled under the provisions of this clause. (c) Except with respect to defaults of subcontractors, Seller shall not be liable for any excess costs if the failure to perform the P.O. arises from causes beyond the control and without the fault or negligence of the Seller. Such causes may include, but are not restricted to, acts of God or the public enemy, acts of Wencor, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of Seller. If the failure to perform is caused by the default of a subcontractor and if such default arises out of causes beyond the control of both Seller and subcontractor, and without the fault or negligence of either of them, Seller shall not be liable for any excess costs for failure to perform unless the goods or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit Seller to meet the required delivery schedule. (d) If the P.O. is canceled as provided in paragraph (a) of this clause, Wencor, in addition to any other rights provided in this clause, may require Seller to transfer title and deliver to Wencor, in the manner and to the extent directed by Wencor, (i) any completed goods, and (ii) such partially completed goods and material, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter "manufacturing materials") as Seller has specifically produced or specifically acquired for the performance of such part of the P.O. as has been canceled, and Seller shall upon direction of Wencor, protect and preserve property in possession of Seller in which Wencor has an interest. Payment for completed goods delivered to and accepted by Wencor shall be at the P.O. price. Payment for manufacturing materials delivered to and accepted by Wencor and for protection and preservation of property shall be in an amount agreed upon by Seller and Wencor. (e) If, after notice of cancellation of the P.O. under the provisions of this clause, it is determined for any reason that the Seller was not in default under the provisions of this clause, the rights and obligations of the parties shall be the same as if the notice of cancellation had not been issued. (f) The rights and remedies of Wencor provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under the P.O. (g) The performance of work under the P.O. may be terminated in whole, or from time to time in part, by Wencor, for its convenience.

**VENUE SELECTION/CHOICE OF LAW** This agreement shall be deemed to have been made in the State of Utah, U.S.A. and shall be interpreted in accordance with the law of the State of Utah without regard to conflict of law principles. Seller consents to the exclusive jurisdiction of the state and federal courts of the state of Utah, for determination of any claim or controversy between the parties arising out of or relating to these terms and conditions of purchase. In the event that Wencor shall engage an attorney or commence an action against Seller arising out of facts and circumstances related to these terms and conditions of purchase including, but not limited to, Seller's breach of any of its obligations

hereunder, Wencor shall be entitled to recover its reasonable attorney's fees, costs, and other disbursements incurred in connection therewith.

Revised January 2005

**EXHIBIT B**



**digEcor**™
Digital Entertainment Solutions

Digital Rights Management
Engineering Program Services Agreement

This agreement for digital rights management engineering program services ("Agreement") is made on November 11, 2005 between digEcor, Inc. a Washington corporation located at 1625 North 1100 West , Springville, Utah, 84663 ("DIGECOR") and e.Digital Corporation, a Delaware corporation located at 13114 Evening Creek Drive South, San Diego, California 92128 ("EDIGITAL"). DIGECOR and EDIGITAL are referred to herein individually as "Party" and collectively as "Parties."

Whereas EDIGITAL has developed a digital rights management ("DRM") technology for protection of multi-media content on closed system portable devices; and

Whereas DIGECOR is interested in having EDIGITAL adapt its DRM technology for use on the DIGECOR portable content unit ("digEplayer"); and

Whereas EDIGITAL has agreed to adapt its DRM technology for the digEplayer and the parties wish to set forth their terms and conditions of agreement;

Therefore DIGECOR and EDIGITAL hereby agree as follows:

1. The DRM Project: The details of the DRM project are set forth in Addendum One. The Addendum One document was provided by EDIGITAL and sets forth a text description and schematic representation of the DRM technology. The Parties agree that Addendum One will govern the DRM Project and that any changes or modifications from what is specifically set forth in Addendum One must be approved in writing by both Parties. The DRM project will be completed with the following schedule ("weeks" are after date of signing this Agreement):

Release 1: 3 weeks - USB + Asian (Sample for ANA)
Release 2: 4 weeks - USB + RBE (Sample for Studios)
Release 3: 6 weeks - USB + Asian + RBE (Field Ready Device)
Release 4: 7 weeks - USB + Asian + RBE + Secure Content Hiding (Field Ready Device)
Release 5: 8 weeks - Ethernet + Asian + RBE (Field Ready Device)
Release 6: 9 weeks - Ethernet + Asian + RBE + Secure Content Hiding (Field Ready Device)

DIGECOR understands that there may be unforeseeable technical issues that may arise that may require a target date to slide a couple of days.

2. License, Fees, and Payment Terms: DIGECOR will pay EDIGITAL a $25,000 one-time flat fee for an unrestricted, unlimited, irrevocable right to use the DRM technology for use on the DIGECOR digEplayer and other DIGECOR products, including the right to modify and add to the

DRM technology at DIGECOR's discretion. The DRM technology labor (man hours) is included as part of this one-time payment and the Parties understand that this not a billable project. This one-time payment will be made after the major movie studios have approved the DRM technology for use on the digEplayer. If the studios do not approve the DRM for use on the digEplayer, DIGECOR has the choice to make the one-time payment and thereby secure the unrestricted, unlimited, irrevocable license or not make a payment and not use the DRM technology. With regard to the DRM technology, the aircraft industry will be an exclusive license for DIGECOR and all other markets will be non-exclusive. Further, the Parties agree that EDIGITAL will have a non-exclusive, unlimited right to use its DRM technology for non-aircraft industries.

3. Responsibilities of EDIGITAL: In order to specifically set forth the obligations of EDIGITAL under this Agreement, the following responsibilities are enumerated with regard to the DRM technology. These responsibilities may or may not be set forth in Addendum One.

- eDigital will develop and/or adapt a PC application to encrypt AVI files with source code and deliver this to DIGECOR
- eDigital will develop and provide firmware programming to support new encryption
- eDigital will provide a detailed programming specification that will enable DIGECOR to implement the encryption on future DIGECOR product lines
- eDigital will provide full support on developing the DRM technology to fully meet or exceed the studio requirements. EDIGITAL will support any needed adjustments to the DRM security to meet the studio needs, if requested. Architectural changes would be outside the scope of these supported changes
- The Parties will mutually agree on the encoding tools used to encode video files to AVI format, such as XVID

4. Responsibilities of DIGECOR: In order to specifically set forth the obligations of DIGECOR under this Agreement, the following responsibilities are enumerated with regard to the DRM technology.

- DIGECOR will use its influence and relationships with the major studios to receive studio approval for the DRM technology
- DIGECOR will provide encoded video content that reflects what will actually be used on the digEplayer
- DIGECOR will provide up to five digEplayers for test purposes

5. Other Matters: New Order: As part of this Agreement, DIGECOR will place an order for 2000 units with 1250 units deliverable immediately. The Parties understand that Maycom will produce the 1250 units, with the payment terms as listed on the purchase order. DIGECOR will release the other units for production at its discretion after January 1, 2006. No upfront payments will be made for the remaining 750 units until they are released for production and then only payable if the manufacturer requires it. DIGECOR and EDIGITAL will work together to place the remaining order with another contract manufacturer, such as Wolf Electronix, at DIGECOR's direction.

6. Other Matters: Programming Requests/Work Orders: As long as there are on-going orders similar to the order history in the past, EDIGITAL will continue to support and develop features

2

for the digEplayer 5500. If an individual request will take longer than 80 man hours and the requested feature does not generate reasonable additional sales, then EDIGITAL and DIGECOR will discuss a fee schedule to cover the work that is beyond 80 man hours. (Ex: A 100 hour project would be 80 no-charge hours and 20 billable hours.) If a requested feature will take longer than 80 man hours, but it will generate reasonable additional sales then the project will be done at no charge. Any language implementation is a non-billable project. The Parties hereby agree to a specific delivery schedule for Release 1, as defined in Section One, for 13 December 2005. The placing of the order for the 750 follow-on units is contingent upon meeting the terms of the P.O for the first 1250 units and meeting the scheduled Releases listed in Section One.

7. Non-Disclosure: The Parties agree that certain information that will be shared as part of this Agreement is considered proprietary by one of the Parties. As such, the Parties agree to identify written materials that it considers confidential and which are not obviously confidential based on the type of information. The Parties will hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information. This Non-Disclosure obligation shall continue for a period of five (5) years beyond the termination of this Agreement. However, the Parties shall not be obligated under this paragraph with respect to information that is or becomes publicly available without restriction.

8. Independent Contractor: Both parties agree that EDIGITAL is an independent contractor and will act as such throughout the term of this Agreement. As an independent contractor, EDIGITAL acknowledges responsibility for all payment of State and Federal taxes, and shall not be entitled to receive any employment benefits including workers' compensation coverage. Notwithstanding any provision hereof, for all purposes of this Agreement, each party shall be and act as an independent contractor and not as partner, joint venturer, or agent of the other.

9. Term of Agreement: The term of this Agreement shall be until the project is completed or one (1) year whichever is shorter. Either party may terminate this Agreement with thirty (30) days written notice to the other party if there is a material breach of a term of this Agreement or if there is a failure to perform under this Agreement. All services and expenses performed at the time of termination are immediately billable. If the Agreement is cancelled by DIGECOR, billings for not yet completed projects will be billable at the standard EDIGITAL hourly rate.

10. Injunctive Relief: The Parties acknowledge that nay extraordinary matters or violations of any of the terms of this Agreement will cause the other party irreparable injury for which adequate remedies are not available at law. Therefore, the Parties agree that the injured Party shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) as a court of competent jurisdiction may deem necessary or appropriate to restrain the other Party from committing any violation of this Agreement. These injunctive remedies are cumulative and in addition to any other rights and remedies the Parties may have at law or in equity.

11. Limitation of Liability:

(a) DRM Warranty. EDIGITAL represents and warrants to DIGECOR that EDIGITAL has all necessary rights, power and authority to enter into and perform this Agreement and to grant the licenses granted to DIGECOR herein. EDIGITAL disclaims all other warranties, either express or implied, including but not limited to, (1) Warranties that the licensed

3

DRM technology, including firmware, software, patents, proprietary information or content is "error free," (2) implied warranties of merchantability, fitness for a particular purpose or otherwise. Except as provided in this Agreement, EDIGITAL's Licensed DRM Technology is provided "as is." EDIGITAL will use reasonable efforts to correct known errors or "bugs" in the Licensed DRM Technology for a period of twelve (12) months from the date of first delivery to DIGECOR ("Warranty Period").

(b) **PROGRAMMING REQUESTS/ WORK ORDERS** Warranty. EDIGITAL represents and warrants to DIGECOR that EDIGITAL has all necessary rights, power and authority to enter into and perform this Agreement and to grant the licenses granted to DIGECOR herein. EDIGITAL disclaims all other warranties, either express or implied, including but not limited to, (1) Warranties that the licensed technology, provided firmware, programming requests, work orders, product enhancements or related modifications, including firmware, software, patents, proprietary information or content is "error free," (2) implied warranties of merchantability, fitness for a particular purpose or otherwise. EDIGITAL provided firmware, programming requests, work orders, product enhancements or related modifications are provided "as is." EDIGITAL will use reasonable efforts to correct known errors or "bugs" in the provided firmware, programming requests, work orders, product enhancements or related modifications for a period of twelve (12) months from the date of first delivery to DIGECOR ("Warranty Period").

(c) **DRM Damages.** DIGECOR's sole and exclusive remedy for any and all claims concerning the DRM project based in contract, tort or otherwise, in law or equity, including but not limited to, claims based upon EDIGITAL's failure to perform under this Agreement, EDIGITAL's breach of this Agreement or EDIGITAL's termination of this Agreement shall be limited to money damages, specifically, the lesser of the actual amount paid under this Agreement or $25,000 USD. In no event will either party be liable to the other for any lost profits, lost savings or any other incidental, special, or consequential damages, even if such party has been advised of the possibility of such damages, arising out of or in connection with the DRM project.

(d) **PROGRAMMING REQUESTS/ WORK ORDERS Damages.** DIGECOR's sole and exclusive remedy for any and all claims concerning EDIGITAL provided firmware, programming requests, work orders, product enhancements or related modifications provided pursuant to this Agreement, based in contract, tort or otherwise, in law or equity, including but not limited to, claims based upon EDIGITAL's failure to perform under this Agreement, EDIGITAL's breach of this Agreement or EDIGITAL's termination of this Agreement shall be termination of this Agreement and/or future orders based upon said firmware, programming requests, work orders, product enhancements or related modifications. In no event will either party be liable to the other for any lost profits, lost savings or any other incidental, special, or consequential damages, even if such party has been advised of the possibility of such damages, arising out of or in connection with work done under this Agreement. Nothing in this paragraph or this Agreement shall affect any prior claim, cause of action, right or liability between the Parties. In no event shall either Party be liable for any monetary damages or specific performance for any firmware, programming requests, work orders, product enhancements or related modifications provided pursuant to this Agreement.

12. **Delays:**

4

(a) Force Majeure. Neither party shall be liable for any failure to meet its obligations if such failure is due to any cause beyond the party's reasonable control. If the force majeure continues for longer than thirty (30) days, either party may terminate the agreement and DIGECOR will pay EDIGITAL all reasonable expenses incurred prior to termination.

(b) Delays. Time is of essence. Delivery commitments by EDIGITAL to DIGECOR are contained in the Agreement. In no event shall EDIGITAL be liable for any delays in delivery or performance caused by failure of DIGECOR to fulfill their obligations as called out in the Agreement.

(c) Order Adjustment. In the event of any delay or any change in the scope of the project, it will require a mutually agreed-upon change order addressing all affected items and/or changes.  No work will be performed by EDIGITAL before written approval is granted.

Agreed to by:

| EDIGITAL Signature | Printed Name | Title | Date |
|---|---|---|---|
| | | | |

| DIGECOR Signature | Printed Name | Title | Date |
|---|---|---|---|
| | Greg Beeston | President | 11/11/05 |

5

(a) Force Majeure. Neither party shall be liable for any failure to meet its obligations if such failure is due to any cause beyond the party's reasonable control. If the force majeure continues for longer than thirty (30) days, either party may terminate the agreement and DIGECOR will pay EDIGITAL all reasonable expenses incurred prior to termination.

(b) Delays. Time is of essence. Delivery commitments by EDIGITAL to DIGECOR are contained in the Agreement. In no event shall EDIGITAL be liable for any delays in delivery or performance caused by failure of DIGECOR to fulfill their obligations as called out in the Agreement.

(c) Order Adjustment. In the event of any delay or any change in the scope of the project, it will require a mutually agreed-upon change order addressing all affected items and/or changes. No work will be performed by EDIGITAL before written approval is granted.

Agreed to by:

FOR
EDIGITAL Corporation

| Signature | Printed Name | Title | Date |
|---|---|---|---|
| | Raber Rivers | S.V.P. | 11/11/05 |

DIGECOR

| Signature | Printed Name | Title | Date |
|---|---|---|---|
| | Greg Deeston | President | 11/11/05 |

5

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement

# Content protection in a Closed System Portable Entertainment Device

Document Number:
Ver 1.0
9/1/2005



13114 EVENING CREEK DRIVE SOUTH · SAN DIEGO, CA 92128

*This document contains confidential and proprietary information that belongs to EDIGITAL Corporation. Using any of the information contained herein or copying or imaging all or part of this document by any means is strictly forbidden without express written consent of EDIGITAL Corporation.*

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement

## TABLE OF CONTENTS

Revision History:

| Version | Date | Author / Compiler | Description |
|---------|------|-------------------|-------------|
| 1.0 | 9/1/2005 | EDIGITAL | Initial release. |

## Overview

This document outlines the technology EDIGITAL intends to use to protect the multi media content to be stored in a closed system portable entertainment device. There are several challenges involved in implementing the content protection aspects in any digital multimedia device, which is going to be used by a wide range of the customers. However in a closed portable entertainment device system where physical security can be implemented, the challenges are not as great.

The approach used in this document offers the optimum quality and the protection with the technologies available today. EDIGITAL is soliciting a response from the content owner – movie studios and other content partners to the outlined proposal. EDIGITAL will work with the content provider to understand and resolve the concerns they may have for the protection of their valuable content.

For the purposes of this document, content protection is grouped into three categories as follows:

- Physical Security
- Encoding
- Digital Security

*Physical Security*
This is the means by which the physical media containing the content is protected. Logs, procedures, and safes typically address this type of protection.

*Encoding*
Security that is implemented during the encoding process, is implemented as proprietary file containers and bit stream format.

*Digital Security*
Typically digital security is applied in the form of encryption algorithms.

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement



Figure 1

# Encoding House

## Encoding

Encoding will be performed using ISO MEPG-4 Advanced Simple Profile.  Security will be applied during the encoding process by modification of file container and content bit stream.  Use of proprietary containers and bit stream format limits the ability to play content on devices other than the target device.

4

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement

The customized encoded file is accomplished using a shell packaging an ISO MPEG-4 encoder.

## Encryption

Following encoding of content at the encoding facility, content is secured using an e. Digital proprietary encryption system. The encryption system used on the content is based on the Advanced Encryption Standard (AES) algorithms.
The content is secured at the time of encoding, so at no time, other than the rendering on the device, is the encoded content unsecured. The clear content prior to rendering only resides in the volatile memory internal to the portable entertainment device system. Content is secured for a class of devices and not specifically for each device. The class can be defined as any logical grouping of devices.

The encryption technique used is the e. Digital Random Block Encoding (RBE) utilizing 128-bit AES encryption to encrypt blocks of data within the MPEG-4 file at random intervals. The intervals ensure that the number of decode errors is sufficient to render the resulting video stream un-viewable. The use of random encrypted blocks is more troublesome to defeat than encrypting the entire content stream. The RBE system is based upon multiple keys to gain access to the RBE definition table and keys. Encryption keys are changed throughout the file to ensure that the security of the content does not rely on a single key. This process is illustrated below in Figure 2.



☐ = File Data     ▨ = AES Encrypted Key 1     ▨ = AES Encrypted Key 15

Figure 2

The size of the encrypted blocks and the random interval between blocks are programmable parameters, allowing the RBE algorithm to be changed as often as necessary to insure un-viewable video.

The details of the RBE process are described below and shown in figure 3.

Each content title contains a secure hashed identifier that is used to locate the content license within the secure license file. The secure license file is encrypted with 128-bit AES encryption. The license file in turn contains a secure hashed identifier that may be used to locate the encrypted master key embedded in Non-Volatile RAM (NVRAM) of the device. Once retrieved from NVRAM the master key must be decrypted using a proprietary method. This results in a clear master key that only ever resides in volatile RAM.

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement

The clear master key, obtained above, is used to decrypt the content license using 128-bit AES encryption. The content license contains the RBE definition table. This definition table is used to locate RBE blocks within the encoded bit stream. The license also contains encrypted data keys that are used to decrypt data blocks after they themselves have been decrypted using a proprietary method.

Information describing the location and the use of a specific RBE key is contained in an RBE definition table. This definition table is used to locate RBE blocks within the encoded bit stream. Once a RBE block is located it can be AES decrypted using the corresponding RBE Key. The output of this decryption is a block that is ready for decoding and rendering.



Figure 2

6

# Distribution Point

When the content is located at the distribution point, Physical Security measures are used.

The distribution point receives secure content from the media-processing center and securely transfers this content to the personal entertainment devices. At no point at the distribution center is the content ever decrypted. Security procedures as described in the PSP procedures protect stored content that is awaiting transfer to personal entertainment devices.

PC's in the distribution point are used to transfer secure content to personal entertainment devices using a variety of interfaces including USB, Firewire, and both Wired and Wireless Ethernet. The content always remains in its original encrypted form while it resides on the distribution point PC's and during the transfer to the personal entertainment devices. To prevent unauthorized access to the personal entertainment device an authentication process is used between the distribution point PC and the device. This authentication process is described in detail in the device security section below.

Secure content received by the personal entertainment device is written in its original encrypted form to the hard drive contained in the device. Content Keys to decrypt the content are not stored with the content on the hard drive in the device, but rather are stored in the device non-volatile memory in such a manner that they cannot be retrieved by any method other than through the internal processor of the personal entertainment device using proprietary techniques.

# Customer

Because physical control of the media is lost for the period when the personal entertainment device is in the customer's hands, EDIGITAL has provided additional security measures to address this concern. These measures include:

- Transfer Interface Host Authentication
- Hardware Data Scramble

## Transfer Interface Host Authentication

In order to prevent attempts to remove content from a personal entertainment device via connection to a PC an Authentication process controls access to the Hard Disk Drive.

The Host Interface (USB, Firewire, wireless or wired Ethernet) connection is disabled at all times unless specifically enabled by the portable entertainment device processor. In order to enable communications to the personal entertainment device a computer must authenticate itself using a

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement

public-private key process.  In order to gain access to the portable entertainment device a Trusted PC host must be running a proprietary authentication application.  The authentication process follows:

- The Portable Entertainment Device (PED) dynamically creates a public private key pair. Each connection results in a different public and private key pair.  The PED private key remains in the internal dynamic memory of the processor and cannot be retrieved.
- The PED sends its public key to the PC host running the authentication application.
- PC host wraps a token, known only to the PED and a Trusted Host, with the received public key. (The token can only be unwrapped using the corresponding private key)
- PC transfers the wrapped token to the PED,
- The PED unwraps the token using its private key.
- If the Token is successfully unwrapped and matches the closely held token then the Host connection is enabled.


## Hardware Data Scramble

Although the content is encrypted and the decryption keys are stored separately from the content an additional level of security is provided to safely store content on the PED Hard Drive.  This security level deters efforts from retrieving the secured content in the event that the unit is stolen and the storage Hard Drive is removed from the PED.  All data written to the hard drive is scrambled using a proprietary algorithm.  The data scrambled includes FAT information thus preventing a computer from even recognizing the format of the drive should it be removed from the PED.

EDIGITAL's solution has hardware based scrambling logic within the PED as shown in the following figure.  In order to access the data from the media, proprietary scramble logic device is used as shown in figure 3.

Addendum 1 to the Digital Rights Management Engineering Program Services Agreement



Figure 4

9

**EXHIBIT C**

Yahoo!  My Yahoo!  Mail   Make Yahoo! your home page                    Search the Web
                                                                          Finance Home - Help

**YAHOO!** FINANCE  **Sign In**
                      New User?Sign Up                                    **EDGAR** Online


**YAHOO! ANSWERS**                                   **WHAT DO YOU WANT TO KNOW ?**
Real people. Real questions. Real answers.
                                                              ( IT'S FREE )

Quotes & Info        Enter Symbol(s):
                     e.g. YHOO, ^DJI              GO  Symbol Lookup | Financial Search

EDIG.OB > SEC Filings for EDIG.OB > Form 8-K on 23-Mar-2006                **All Recent SEC Filings**

Show all filings for E DIGITAL CORP | Request a Trial to NEW EDGAR Online Pro

## Form 8-K for E DIGITAL CORP

**23-Mar-2006**

## Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sh

**ITEM 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

On November 11, 2005, in the normal course of our business, we placed a purchase order for 1,250 digEplayers with our contract manufacturer, Maycom Co., Ltd. ("Maycom"). Maycom was paid progress payments with final payments made in full for the order by e.Digital and directly by our customer, digEcor ("digEcor") in March, 2006.

Maycom has fulfilled orders for digEplayers since 2003, and has fulfilled orders for other products manufactured for e.Digital and its customers since 2000. On March 20, 2006 we became aware of information indicating that Maycom may be unwilling or unable to complete the purchase order for product intended for delivery to digEcor. We were advised that digEcor made an onsite inspection of order progress in January, 2006 prior to final progress payments being made.

We are investigating this matter, as well as discussing alternatives and actions with Maycom and digEcor. We expect Maycom to fulfill their obligation under the purchase order and we intend to take remedial steps including legal action, if necessary. We believe there are alternative suppliers that may be able to complete the order if Maycom is unable to do so. We are also evaluating if any third parties have interfered with our business relationship with Maycom.

We are unable to determine at this time the impact this matter may have on our financial position or results of operations if Maycom does not timely fulfill its obligation to us and we are unable to deliver product to our customer, digEcor, in a timely manner. We have not recognized any revenue or costs related to products associated with this order, as we only recognize revenues and associated costs when products are delivered to and accepted by our customer. We have approximately $600,000 in deposits to Maycom as a current asset and approximately $790,000 of deposits from digEcor as a current liability related to the digEplayers associated with this order. Our deposits with Maycom may be impaired and we could be obligated to digEcor for their deposits to us if product is not delivered. We intend to seek restitution from Maycom for any damages we may incur from this matter.

Maycom is not involved in the design, tooling or production of our proprietary eVU mobile entertainment product.

Add EDIG.OB to Portfolio    Set Alert    Email to a Friend

Get **SEC Filings** for Another Symbol: [ GO ] Symbol Lookup

Quotes & Info for EDIG.OB - All Recent SEC Filings

**Sign Up for a Free Trial to the NEW EDGAR Online Pro**
Detailed SEC, Financial, Ownership and Offering Data on over 12,000 U.S. Public Companies.
Actionable and easy-to-use with searching, alerting, downloading and more.
Request a Trial     Sign Up Now

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**EXHIBIT D**

**e.Digital**
c o r p o r a t i o n

| HOME | TECHNOLOGY PLATFORMS | OEM SERVICES | COMPANY | INVESTORS |

**↗ SMART SOLUTIONS FOR A DIGITAL WORLD ®**
COMPREHENSIVE DIGITAL PRODUCT DEVELOPMENT

**CORPORATE NEWS & PRESS RELEASES**

**03/23/06**
SHAREHOLDER ALERT

# e.DIGITAL CORPORATION FILES FORM 8-K REGARDING STATUS OF 1250 UNIT DIGEPLAYER™ ORDER

Company Will Release Further Information Regarding Order,

eVU™ Business Developments, and Efforts to Monetize

Flash Memory-Related Patent Portfolio Next Week

**(SAN DIEGO, CA, March 23, 2006) – e.Digital Corporation (OTC: EDIG)**, a leading innovator of proprietary flash memory management and secure digital video technology, today filed a Form 8-K with the Securities and Exchange Commission regarding the status of its 1250 unit digEplayer™ order placed by customer, digEcor, in November 2005. Following (*in italics*), is the body of the Form 8-K filed today:

*On November 11, 2005, in the normal course of our business, we placed a purchase order for*

1250 digEplayers with our contract manufacturer, Maycom Co., Ltd. ("Maycom"). Maycom was paid progress payments with final payments made in full for the order by e.Digital and directly by our customer, digEcor ("digEcor") in March, 2006.

Maycom has fulfilled orders for digEplayers since 2003, and has fulfilled orders for other products manufactured for e.Digital and its customers since 2000. On March 20, 2006 we became aware of information indicating that Maycom may be unwilling or unable to complete the purchase order for product intended for delivery to digEcor.  We were advised that digEcor made an onsite inspection of order progress in January 2006 prior to final progress payments being made.

We are investigating this matter as well as discussing alternatives and actions with Maycom and digEcor. We expect Maycom to fulfill their obligation under the purchase order and we intend to take remedial steps including legal action, if necessary. We believe there are alternative suppliers that may be able to complete the order if Maycom is unable to do so. We are also evaluating if any third parties have interfered with our business relationship with Maycom.

We are unable to determine at this time the impact this matter may have on our financial position or results of operations if Maycom does not timely fulfill its obligation to us and we are unable to deliver product to our customer, digEcor, in a timely manner. We have not recognized any revenue or costs related to products associated with this order, as we only recognize revenues and associated costs when products are delivered to and accepted by our customer. We have approximately $600,000 in deposits to Maycom as a current asset and approximately $790,000 of deposits from digEcor as a current liability related to the digEplayers associated with this order. Our deposits with Maycom may be impaired and we could be obligated to digEcor for their deposits to us if product is not delivered. We intend to seek restitution from Maycom for any damages we may incur from this matter.

Maycom is not involved in the design, tooling or production of our proprietary eVU™ mobile entertainment product.

Next week, e.Digital will issue an update regarding this order, and also release information regarding eVU™ business developments, its efforts to monetize its wholly-owned flash memory-related patent portfolio, and other business.

**About e.Digital Corporation:** e.Digital Corporation specializes in the delivery, management, and protection of secure digital content through its proprietary technology platforms. Through customer and partnering relationships, e.Digital is a provider of secure portable Video on Demand products. e.Digital's services include the licensing of the Company's MicroOS™, Content Mark-Up Language (CML) application, patent-pending hardware security technology, Digital Rights Management (DRM) solutions, and video display software applications. In addition, e.Digital partners with leading, innovative companies,

designing and providing manufacturing services for products employing the Company's proprietary digital technology platforms. For more information about e.Digital and its technology platforms, please visit the company website at www.edigital.com.

**Safe Harbor statement under this Private Securities Litigation Reform of 1995:** All statements made in this document, other than statements of historical fact, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act. You should not place undue reliance on these statements. We base these statements on particular assumptions that we have made in light of our industry experience, the stage of product and market development, expected future developments and other factors that we believe are appropriate under the circumstances. These forward-looking statements are based on the then-current expectations, beliefs, assumptions, estimates and forecasts about the businesses of the Company and the industries and markets in which the company operates. These statements are not guarantees of future performance and involve risks, uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to the Company's ability to finance its operations, sell its products, implement a turnkey financial, product, and maintenance solution, manufacture and ship orders in a timely manner, secure additional business, and other risks identified and discussed in our filings with the Securities and Exchange Commission ("SEC"). Actual outcomes and results may differ materially from what is expressed or implied by the forward-looking statements. More information about potential factors that could affect the Company can be found in its most recent Form 10-K, Form 10-Q and other reports and statements filed with the Securities and Exchange Commission ("SEC"). e.Digital Corporation disclaims any intent or obligation to update these or any forward-looking statements, except as otherwise specifically stated by it.

Note: eVU and MicroOS are trademarks of e.Digital Corporation. All other company, product, and service names are the property of their respective owners.

CONTACT:
e.Digital Corporation: Robert Putnam, (858) 679-4408, rputnam@edigital.com

e.Digital Mailing List

TO RECEIVE e.DIGITAL SHAREHOLDER ALERTS, PRESS RELEASES AND GENERAL INFORMATION VIA EMAIL, CLICK THE LINK BELOW TO JOIN THE e.DIGITAL MAILING LIST.

CONTACT e.DIGITAL

HOME

Copyright © 2005-2006, e.Digital Corporation, Inc.

**EXHIBIT E**

Yahoo!   My Yahoo!   Mail   Make Yahoo your home page

Search the Web
Finance Home – Help

# YAHOO! FINANCE

Sign In
New User?Sign Up

**Home   Investing   News & Commentary   Retirement & Planning   Banking & Credit   Loans   Taxes**

Special Editions   Columnists   Personal Finance   Investing Ideas   Markets   Company Finances   Providers

Get Quotes   | GO | Symbol Lookup | Finance Search



Tap Into advanced trading tools.

_7 Trades_ _Scottrade_

Related Qu
EDIG.OB 27–Apr 3:5
0.145

0.140

0.135
10am   12pm
EDIG.OB   0.14
**View Detailec**
Delayed 20 i
Providers - Disc

**Press Release**   Source: e.Digital Corporation

# e.Digital Corporation Announces eVU(TM) Business Developments

Thursday March 30, 8:30 am ET

## Company Reports on Efforts to Monetize Flash Memory-Related Patent Portfolio

SAN DIEGO–(BUSINESS WIRE)--March 30, 2006–e.Digital Corporation (OTC:EDIG - News), a leading innovator of secure digital video technology and products and patented technology in the utilization of flash memory in portable devices, today announced it has begun receiving orders for its new proprietary eVU portable entertainment product from companies in the healthcare and travel and leisure industries. The company also unveiled a new, comprehensive eVU website (www.edigital.com/evu.htm) where prospective customers and other interested parties can take a virtual eVU tour, read its specifications and request additional information.

**Related News**

- E DIGITAL CORP form 8-K, Creation Financial Obligatic Obligation under a Balance Sh - EDGAI (Thu Mar 23)

- E DIGITAL CORP form 8-K, Entry int Agreement, Sale c Material Modificati Financial S - EDGAR (Mon Feb 27)

- E DIGITAL CORP EDGAR Online Financia

- E DIGITAL CORP form 8-K, Other Ev Online (Fri Feb 17)

ADVERTISEMENT

## Double Your Money...

Alexandria, VA — If you can earn 24% per year, your portfolio doubles nearly _every three years._ Is your money growing as fast as it can?

David and Tom Gardner's _Motley Fool Stock Advisor_ banked 24.2% annually since inception.

Discover their secret and get David & Tom's highest-rated stocks in their latest report, "The Motley Fool's Top 2 Picks -- Plus _Wall Street's Dirtiest Secret_"

This research is FREE to individual investors now.

Click here for "The Motley Fool's Top 2 Picks!" ▶

_A trusted service from The Motley Fool_

Based on e.Digital's proprietary digital video technology, eVU features razor-sharp images on its 7" high resolution LCD screen, superb audio fidelity, dual stereo headphone jacks, embedded credit card reader/processor, touch screen capabilities, bright full featured graphical user interface, e.Digital's patent-pending hardware security technology, 10 hours of high resolution video playback on a single battery charge, and other advanced features.

"With pilot builds and trials behind us, we are now accepting volume eVU orders. eVU product maturity and the launch of our eVU website positions us to make further progress in building our eVU closed system Video On Demand (VOD) business," said Will Blakeley,

- By industry: Electr Equipment



**Top Stor**

- Microsoft 3Q Profi Misses Views - AP (

- Bernanke: Fed Ma Rate-Hike Campai pm)

e.Digital's president and chief technical officer. "We are also responding to direct requests from individual airlines and IFE providers on eVU business opportunities. We have also made inroads with military organizations on secure video applications utilizing e.Digital's proprietary technology. We expect to fulfill current and expected eVU orders next quarter and throughout calendar 2006."

Addressing e.Digital's recently announced efforts to monetize its flash memory-related patent portfolio, Blakeley commented, "According to research from CLSA Asia-Pacific Markets, global demand for flash memory is expected to reach $25 billion this year, due mainly to the rapid proliferation of handheld devices. We believe the timing and climate are right for us to pursue monetizing our flash memory-related patent portfolio which we believe contains fundamental and valuable claims regarding the use of embedded and removable flash memory in portable

devices."

e.Digital holds five flash memory-related patents (#5,491,774, #5,742,737, #5,787,445, #5,839,108, #5,842,170--The assignee name on four of the patents is Norris Communications, now known as e.Digital Corporation--The assignee name on the fifth patent is Comp General Corporation, a then-wholly owned subsidiary of Norris Communications).

"We have initiated the process of having the patents and claims independently evaluated," concluded Blakeley. "When the evaluation process is completed, and with the assistance of an intellectual property management company, our strategy is to aggressively pursue licensing agreements with companies we believe have products utilizing e.Digital's intellectual property."

About e.Digital Corporation:. e.Digital Corporation specializes in the delivery, management, and protection of secure digital content through its proprietary technology platforms. Through customer and partnering relationships, e.Digital is a provider of secure portable Video On Demand products. e.Digital's services include the licensing of the Company's MicroOS(TM), Content Mark-Up Language (CML) application, patent-pending hardware security technology, Digital Rights Management (DRM) solutions, and video display software applications. In addition, e.Digital partners with leading, innovative companies, designing and providing manufacturing services for products employing the Company's proprietary digital technology platforms. For more information about e.Digital and its technology platforms, please visit the company website at www.edigital.com.

Safe Harbor statement under the Private Securities Litigation Reform of 1995: All statements made in this document, other than statements of historical fact, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act. You should not place undue reliance on these statements. We base these statements on particular assumptions that we have made in light of our industry experience, the stage of product and market development, expected future developments and other factors that we believe are appropriate under the circumstances. These forward-looking statements are based on the then-current expectations, beliefs, assumptions, estimates and forecasts about the businesses of the Company and the industries and markets in which the company operates. These statements are not guarantees of future performance and involve risks, uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to the Company's ability to finance its operations, sell its products, implement a turnkey financial, product, and maintenance solution, manufacture and ship orders in a timely manner, secure additional business, monetize its flash memory-related patent portfolio, and other risks identified and discussed in our filings with the Securities and Exchange Commission ("SEC"). Actual outcomes and results may differ materially from what is expressed or implied by the forward-looking statements. More information about potential factors that could affect the Company can be found in its most recent Form 10-K, Form 10-Q and other reports and statements filed with the Securities and Exchange Commission ("SEC"). e.Digital Corporation disclaims any intent or obligation to update these or any forward-looking statements, except as otherwise specifically stated by it.

Note: eVU is a trademark of e.Digital Corporation. All other company, product, and service names are the property of their respective owners.

*Contact:*

e.Digital Corporation
Robert Putnam, 858-679-1504
rputnam@edigital.com

Source: e.Digital Corporation

✉ Email Story          📢 Set News Alert          🖨 Print Story

- Dow Closes Up 2?
  Finishes Up 11 - AF
- Prosecutor Questi
  Enron Trial - AP (6:5

- Most-emailed artic
- Most-viewed articl

RSS Fee

Add headlines to you
personalized My Yal
( About My Yahoo! and

EDIG.OB Headlines

Electronic Equipment I

More Finance RSS Fe

| Search News |

Sponsor Results

Investing Online: $7 Trades at Scottrade
Invest online for $7 per trade, unlimited shares. No inactivity fees. Powerful trading tools. Easy access to research and
account information. Brokers to assist you in offices nationwide.
www.scottrade.com

Stock Investing Guide
Hot stock picks for tomorrow. Penny stock tip investments, undervalued situations, IPOs, obscure penny stocks, and
other great stock picks. Free report.
www.rocketstockpicks.com

Earn 4.80% APY by Investing in Savings
We help you open a 4.80% APY FDIC-insured savings account.
www.earlyearners.com

(What's This?)

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2006 Business Wire. All rights reserved. All the news releases provided by Business Wire are copyrighted. Any forms of copying other
than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials by posting,
archiving in a public web site or database, or redistribution in a computer network is strictly forbidden.

**EXHIBIT F**

Sent By: OLYMPIA COPY & PRINTING;          360 943 0168;          Oct-10-05  1:23PM;          Page 1/2

04/02/2002 TUE 13:41 FAX 858 748 0804 EDIGITAL                                                    @002

04/02/2002 00:48 FAX 2539619808          KINKO'S LAKEWOOD

## NONDISCLOSURE AGREEMENT

THIS AGREEMENT is entered into by and between ___E. Di di to Cred___ (known as "RECIPIENT"), both as an individual and on behalf of any entity represented by RECIPIENT, and William J. Boyer, Jr., doing business as William J. Boyer, Jr. and/or Aircraft Protective Systems, Inc. (collectively referred to herein as "William J. Boyer Jr."), on the date indicated below.

This Agreement shall govern the conditions of disclosure by WILLIAM J. BOYER, JR. to RECIPIENT of certain "Confidential Information" including but not limited to prototypes, drawings, data, trade secrets and intellectual property relating to the "Patent Pending" any and all products and/or materials disclosed in confidence by WILLIAM J. BOYER, JR. With regard to the Confidential Information, RECIPIENT hereby agrees;

1.  Not to use the information therein except for evaluating its interest in entering a business relationship with WILLIAM J. BOYER, JR.

2.  To safeguard the information against disclosure to others with the same degree of care as exercised with its own information of a similar nature.

3.  Not to disclose the information to others, without the express written permission of WILLIAM J. BOYER, JR. except that:

    a.  which RECIPIENT can demonstrate by written records was previously known;

    b.  which are now, or become in the future, public knowledge other than through acts or omissions of RECIPIENT

    c.  which are lawfully obtained by RECIPIENT from sources independent of RECIPIENT;

4.  That RECIPIENT shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell, or otherwise deal with any item product, containing, based upon or derived from the information, except as may be expressly agreed to in writing by WILLIAM J. BOYER, JR.

5.  It is understood and agreed that the subject matter and information being disclosed, and all novel aspects thereof, shall not be used commercially, nor otherwise to others by the RECIPIENT, either directly or indirectly, without the express prior written consent of WILLIAM J. BOYER, Jr.

6.  Non-Competition: RECIPIENT agrees not to compete with APS, Inc. directly or indirectly during the term of this Agreement and for a period of seven (7) years after the termination of this agreement anywhere in the world by years after termination of this agreement anywhere in the world by manufacturing and/or selling like, or similar components: (any and all components that APS, Inc. and manufactured, designed etc. RECIPIENT shall be deemed to be competing with APS, Inc. if it is a general or limited partner in a partnership that is competing with APS, Inc, or if RECIPIENT directly or as association is competing with APS, Inc.

7.  Binding Effect of Agreement: RECIPIENT and APS, Inc. agree that all the terms and provisions of this agreement are valid and binding at all times.

Sent By: OLYMPIA COPY & PRINTING;          360 943 0163;          Oct-10-03  1:23PM;          Page 2/2
04/02/2002 TUE 15:41  FAX 858 748 5884 EDIGITAL                                                     @003
                                              KINKO'S LAKEWOOD
04/02/2002 09:48 FAX ‡8581839886

WILLIAM J. BOYER, JR. will be entitled to obtain an injunction to prevent threatened or continued violation of this Agreement, but failure to enforce this Agreement will not be deemed a waiver of this Agreement.

IN WITNESS WHEREOF the Parties have hereunto executed this Agreement as of the day and year first above written.

Dated this 02 day of April , 2002.

RECIPIENT:

By: _____

e-Diatal Corp
Company Name

#13114 Evening Creek Dr. So.
Address

San Diego, CA. 92128
City/ State                          Zip

(858) 679-1504
Phone Number

_____
WILLIAM J. BOYER, JR., President

**EXHIBIT G**



DRAFT WJB

## AGREEMENT

This Agreement is made this 2 2 day of OCTOBER , 2002 ("Effective Date") by and between e.Digital Corporation, a Delaware corporation with an office and place of business at 13114 Evening Creek Drive South, San Diego, California 92128 United States of America (hereinafter "e.Digital") and Aircraft Protective System, Inc., with an office and place of business at 7406 Custer Road West, Tacoma, Wa. 98499 (hereinafter "APS").

WHEREAS, e.Digital has developed and has rights to technologies utilizing its patented technology, trade secrets and know-how; and,

WHEREAS, APS desires to use e.Digital's technologies and have e.Digital develop a portable video device ("Video Device") for Alaska Airlines; and,

WHEREAS, e.Digital and APS are willing to enter into an Agreement for the design and manufacture of a Video Device and other products utilizing e.Digital's technologies.

NOW, THEREFORE, the parties hereto agree as follows.

A.   BACKGROUND.
The parties hereto contemplate a business relationship in which APS will plan various products and where e.Digital shall design and develop such products ("Products"). Additionally, should APS require, e.Digital shall manufacture such products for APS. The purpose of this Agreement is to provide the framework for such a business arrangement. This Agreement shall consist of the basic terms and conditions together with exhibits, which may be modified by the parties from time to time so as to provide for the specifics of the different design and development projects.

B.   PRODUCT SEPCIFICATIONS.
1.   Product Design Specifications.
Exhibit A hereto contains the product design specifications ("Product Design Specifications") for the design and development to be undertaken by e.Digital for APS. This Exhibit may be modified with additional products and/or modifications to existing design and development projects upon the written request of APS. Such modifications shall take the form of written modifications signed by the parties, which modifications shall then be substituted for and/or added to the existing Exhibit A.

2.   Functional Specifications.
In accordance with the Statement of Work, hereinafter described, e.Digital shall develop, complete and deliver to APS a detailed functional specifications document ("Functional Specifications") setting forth the functional

e.Digital/APS
11-13-00

1

capabilities and requirements of the Products contemplated under this Agreement. APS shall accept or reject the Functional Specifications within ten (10) business days of the receipt thereof. In the event APS rejects the Functional Specifications, it shall notify e.Digital in writing specifying the nature of the deficiencies or inadequacies contained in the document. e.Digital shall then have ten (10) business days from receipt of this written rejection to correct such deficiencies.

3.  Design Changes.
APS shall have the right, in its sole discretion, to request changes from time-to-time, to any portion of the Product design as set forth in this Article C. Any such request shall be made in writing by APS to e.Digital. e.Digital shall have ten (10) business days to review and accept such changes. In the event such changes shall impact the cost of such Product, e.Digital shall provide APS with such cost impact.

C.  PRODUCT PRICING.
Exhibit B shall contain the pricing for the product(s)s to be designed and developed by e.Digital for APS. This Exhibit may be modified with additional products and/or modifications to existing Projects. Such modifications shall take the form of written modifications signed by the parties, which modifications shall then be substituted for and/or added to the existing Exhibit B. e.Digital shall notify and obtain approval from APS prior to incurring any outside vendor expenses for the Projects.

Exhibit D shall contain revenue sharing for future markets, customers and/or added enhancements of peripherals and services for this device. Both parties agree to work in good faith to negotiate a revenue split on products built from the initial platform which is developed for this IRE system.

D.  STATEMENT OF WORK.
1.  Statement of Work.
Exhibit C shall contain the Statement of Work(s) for the Products to be designed and developed by e.Digital for APS in accordance with the Projects. Such Statement of Work shall include applicable schedules, milestones or phases for the respective product. Exhibit C may be modified with additional products and/or modifications to existing Projects. Such modifications shall take the form of written modifications signed by the parties, which modifications shall then be substituted for and/or added to the existing Exhibit C.

2.  Project Timetable.
In order to facilitate completion of the Projects on a timely and cost-efficient manner, a timetable ("Project Timetable") shall be established and incorporated into Exhibit C. This Project Timetable shall set forth the principal tasks ("Development Tasks") which must be completed by e.Digital as part of its design and development in accordance with the Statement of Work.

3. Critical Performance Milestones.
Exhibit C shall identify all critical milestones ("Critical Milestones") which must occur as part of the Project. In the event any Critical Milestone fails to occur by its performance date set forth in Exhibit C, e.Digital shall be deemed to be in material breach of this Agreement.

4. Acceptance Testing.
In accordance with the Project Timetable contained in Exhibit C, e.Digital shall supply the Product to APS for review and acceptance ("Acceptance Period"). APS shall have thirty (30) days in which to conduct acceptance testing in accordance with the Statement of Work and may accept or reject the proposed Product during that time. APS shall advise e.Digital in writing of any Functional Specification non-conformity revealed during the Acceptance Period. e.Digital shall promptly correct such non-conformity and deliver to APS appropriate documentation for such correction.

5. Prototypes.
When the Statement of Work (Exhibit C) for a Project calls for prototype(s), e.Digital shall, complying with the Product Design Specifications and the Functional Specifications, prepare fully functional prototype(s) for APS's review and acceptance. e.Digital shall operate the prototype(s) in a test mode as set forth in Exhibit C. Within ten (10) business days after the conclusion of such testing, e.Digital shall provide APS a written summary and analysis of the results of such testing as set forth in Exhibit C.

E.    BOOKS, RECORDS AND RIGHT OF INSPECTION.

1. Books and Records.
APS shall keep complete books of account and records of all Products which utilize e.Digital technology and are manufactured, sold, distributed or otherwise disposed of, and all transactions relating to APS's activities in connection with this Agreement. Such books and records shall be kept in accordance with Generally Accepted Accounting Principles (GAAP) of the United States, consistently applied and shall be retained by Samsung and kept available for inspection, copying and/or auditing by e.Digital for at least three (3) years after the termination of this Agreement.

2. Right of Inspection by e.Digital.
e.Digital shall have the right, through its personnel or an independent auditor selected by e.Digital and at e.Digital's expense, to inspect and copy the books of account and records referred to in Paragraph 1. of this Article E., and to interview the employees, agents and accountants responsible for the preparation and maintenance of such books of account and records on behalf of APS for the purpose of verifying the accuracy of such books and records and the reports provided for herein; provided however, that such examination shall be made during normal business hours upon reasonable notice and not more than once per calendar year. Any such audit shall utilize Generally Accepted Auditing Standards (GAAS) of the United States.

3.  Right of Inspection by APS.
APS shall have the right, upon reasonable notice to e.Digital and not more than once per calendar year, to inspect the books and records of e.Digital relating to the Projects for the purpose of verifying the accuracy of any Project cost or Project invoice submitted by e.Digital to APS. Any such audit shall be conducted at e.Digital's principal place of business during normal business hours and at APS's expense.

4.  Confidentiality of Information.
Both parties agree not to divulge to third parties any confidential information obtained from the books and records of the other party as a result of such inspections unless such information (a) was known to the auditing party prior to its acquisition by that party as a result of such inspection, (b) was known to auditing party from sources other than the other party, or, (c) becomes a matter of public knowledge other than by breach of this Agreement by the auditing party.

F.    REPRESENTATIONS BY e.DIGITAL.
e.Digital represents and warrants to APS:
1.  The design and development completion dates have been represented by e.Digital to the best of its ability and such projections are based upon e.Digital's expertise and experience in designing and developing products comparable to the Products.
2.  Subject to the fulfillment by APS of its obligations hereunder, e.Digital agrees to complete and commit sufficient manpower and resources to insure completion of each Project.
3.  All Project personnel assigned by e.Digital to perform any of its obligations hereunder shall be fully qualified to perform the tasks assigned to them.

G.    PROJECT MANAGERS.
1.  e.Digital and APS shall each designate in writing one (1) individual to serve as its Project Manager for the Projects through final acceptance, as set forth in Exhibit C, Statement of Work. The APS Project Manager or the e.Digital Project Manager shall be deemed to have authority to execute, grant or provide any approvals, requests or contract amendments or other communications as provided hereunder for their respective companies.
2.  Once every month the Project Managers, together with any other required personnel, shall discuss performance of their respective obligations hereunder. Prior to such meeting, e.Digital shall discuss all problems encountered since the last meeting and identify all steps taken to resolve the problems.

H.    WARRANTY.
e.Digital warrants that the Products will conform to the Product Specifications and will be free from defects in material and workmanship for a period of twelve (12) months from the date of shipment. e.Digital shall replace all defective Products during such period, provided that: (a) APS shall have notified e.Digital within thirty (30) days of APS's discovery of any alleged defect during the

4

10/14/2003 12:59     7486894          EDIGITAL

warranty period; and (b.) the Products have not been damaged, subjected to misuse or abnormal operation, altered or improperly repaired or maintained by APS.

APS shall return to e.Digital transportation prepaid, all defective Products covered under a warranty claim. Products repaired or replaced under warranty by e.Digital will be shipped to APS F. O. B. destination.

THE WARRANTIES CONTAINED IN THIS ARTICLE ARE IN LIEU OF ALL OTHER WARRANTIES EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY.

I.   NON-DISCLOSURE.
Each party covenants and agrees that it will, notwithstanding that this Agreement shall have terminated or expired, keep in confidence and prevent the disclosure to any person or persons of all technical information and data (hereinafter "Data") which is designated in writing, or by appropriate stamps, or legend by the disclosing party, to be of a proprietary or confidential nature and is received from the other party under this Agreement and which pertains to proprietary or confidential Data regarding its technological techniques, inventions, research and development or business information. In order to be protectible hereunder, Data which is first disclosed orally or by demonstration must be identified as proprietary or confidential at the time of disclosure and shall be reduced to writing or other tangible form, marked as proprietary or confidential and a copy delivered to the receiving party by the disclosing party within thirty (30) days after such disclosure or demonstration of any such Data. Provided however, that neither party shall be liable for disclosure of any Data if the same:
1.  Was in the public domain or in the possession of the receiving party without restriction at the time is was disclosed; or
2.  Is used or disclosed with the prior written approval of the disclosing party; or
3.  Is used or disclosed after five (5) years from the date of first receipt under this Agreement; or
4.  Becomes known to the receiving party from a source other than the disclosing party without breach of this Agreement by the receiving party; or
5.  Is made available by the disclosing party to a third party on an unrestricted, non-confidential basis.

J.   TERM AND TERMINATION.
1.  Term of Agreement.  This Agreement shall commence on the Effective Date and shall continue for a period of three (3) years thereafter, unless terminated earlier as provided in this Article I.
2.  If for any reason APS decides not to proceed with the production of the designed product and/or is default on its payment terms & conditions to e.Digital, e.Digital shall have free and unrestricted access to market the design.  If for any reason e.Digital decides not to proceed with the project, it is agreed that APS shall have free and unrestricted access to all designs and

e.Digital/APS
11-13-00

5

intellectual property incorporated into the product design and/or developed up to that point without payment of royalty to e.Digital for its intellectual property used in this product.

3. Termination for Cause.  This Agreement may be terminated for cause by one party for a material breach by the other party. Failure to make payments when due shall constitute a material breach. Should a party believe there has been a material breach by the other party, then that party shall send written notice setting forth the breach to the other party. The other party shall have forty-five (45) days to cure the breach, except for the breach to make payments when due, which must be cured within thirty (30) days. If the breach is not cured by the end of this period, or there have been repetitive breaches by the other party, the first party provide written notice to the other party terminating this Agreement for cause. Said termination shall be effective thirty (30) days after the issuance of such notice.

4. Termination for Convenience.  APS may terminate this Agreement for convenience upon three (3) months written notice to e.Digital.

5. Survival.  Notwithstanding the termination or expiration of this Agreement, the obligations of the parties under Article L (Non-Disclosure) as well as under any other provisions of this Agreement, which by their nature, are intended to survive termination or expiration will survive and continue enforceable.

K.   NOTICE.
All notices herein shall be made by registered or certified mail or by a delivery service which provides a delivery receipt. Said notice shall be made to APS at the following address:

> 7406 Custer Road West
> Tacoma, WA. 98499

and to e.Digital at:

> 13114 Evening Creek Drive South
> San Diego, CA 92128

or to such address as may be designated in writing by either party.

L.   APPLICABLE LAW.
This Agreement is made in accordance with and shall governed and construed in accordance with the laws of the State of New York.

M.   LIMITATION OF LIABILITY.
IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LOST PROFITS, LOST SAVINGS OR ANY OTHER INCIDENTIAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH PARTY HAS

6

e.Digital/APS
11-15-00

BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

N.   WAIVER.
No waiver of any provision of this Agreement or any rights or obligations of either party hereunder shall be effective, except pursuant to a written instrument signed by the party or parties waiving compliance and any such written waiver shall be effective only in the specific instance and for the specific purpose stated in such writing.

O.   ASSIGNMENT.
This Agreement may not voluntarily be assigned in whole or in part, by either party, without the prior written consent of the other party, except upon merger, consolidation or other transfer of all or substantially all of the assets of either party. Either party may, however, assign this Agreement to its wholly or majority owned subsidiaries without the prior written consent of the other, as long as the transferor remains liable hereunder.

P.   SEVERABILITY.
Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of the Agreement.

Q.   ENTIRE AGREEMENT.
This Agreement constitutes the entire understanding and agreement between the parties with respect to the transactions contemplated herein and supercedes any and all prior oral or written communications with respect to the subject matter herein.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective date.

eDIGITAL CORPORATION                    APS,

By: _____              By: _____

Name: _FRED FALK_                      Name: _WILLIAM J. BOYER JR_

Title: _C E O_                         Title: _President_

Date: _OCTOBER 22, 2002_               Date: _October 22, 2002_

eDigital/APS
11-13-00

7

EXHIBIT A.
PRODUCT SPECIFICATIONS

In-flight Entertainment Device
Portable Digital Movie/Music Player Features

# 1  Product Overview

Portable Digital Movie / Music Player is designed for In-flight Entertainment
Requirements.

## 1.1  Key Aspects

1) Programmable Compact Portable Audio Video Player with 7.0" TFT LCD Screen
2) MPEG4 Video and ADPCM/MP3 Audio Player
3) Fast Transfer of the content from Video-Port

# 2  Features

* Media

  * 20GB Hard Drive

    * Up to 40 hours of films at 1Mbps at pre defined quality level. The
      higher bit rate for better quality will reduce the number of hours
      stored on media.

      OR

    * 330 hours of MP3 music at 128 kbps

* Format

eDigital/APS
11-13-00

8

- o  Video Decoder
  - ×  MPEG4 with CIF resolution – 352 X 288 at 24 fps
- o  Audio Decoder
  - ×  ADPCM up to 128 kbps
  - ×  MP3 up to 320 kbps
- o  Firmware Upgradeable codecs – Limited by the available Flash Size

- Video Resolution
  - o  CIF resolution – 352 X 288
- Video Output – None
- Audio Analog Outputs – Earphone socket

- Display:
  - o  7.0" TFT Display with back light
  - o  480 X  234 X 3 Pixels
  - o  Aspect Ratio: 16 : 9
  - o  Viewing Direction – 6:00
  - o  Contrast Ratio: 150: 1
  - o  Brightness: 350 to 400 cd/m2
- Battery:
  - o  User Replaceable – Replacement battery can be given if needed for longer flights
  - o  3.7V X 10.5Ah Li-Ion (Up to 6 hours play back with Video and back light on)
- Supplied Accessories
  - o  Headphone
  - o  Charger / USB Port
  - o  Carrying Case – Optional
- Weight and Dimensions

9

- o   180mm X 140mm X 35 mm

- Operating Temperature

  - o   + 5 deg. C to +45 deg C

- Storage Temperature

  - o   -20 deg. C to +70 deg C

- User Interface

  - o   Play, Pause, Stop, FF, REW

  - o   Brightness, Contrast Control

  - o   Movie Index – Select

  - o   Subtitle Language Select

  - o   Battery Low indication

- PC Interface

  - o   USB 2.0 with Video-Port PC Software to transfer the content

- Film Studio Related Features

  - o   Digital Right Management

  - o   Closed Architecture System - TBD

  - o   USB port active only in the Video Port docking station

  - o   Battery port only active in proprietary docking connector

- Video Port Features

  - o   USB Docking station for Voyager

  - o   Fast Battery Charger – 4 hours

- Optional Firmware Upgrades at Additional Cost

  - o   Games Features – TBD

  - o   Subtitle – Closed Caption Support – TBD with Studios and capturing technology

eDigital/APS
11-13-00

10

# EXHIBIT B
## PRODUCT PRICING
### Alaska Airline – Budgetary Figures

| | |
|---|---|
| Ode 1000 | $170.00 |
| Display | $140.00 |
| Battery | $50.00 |
| DSP | $10.00 |
| Case | $5.00 |
| Head phone | $5.00 |
| Flash | $5.00 |

| | |
|---|---|
| BOM | $385.00 |
| Manufacturing | $452.94 |
| e.Digital | $50.00 |
| FOB | $502.94 |

| | |
|---|---|
| Tooling cost | $100,000.00 |
| NRE For Device | $150,000.00 |
| NREF for systems specs | |
| PC-application DRM | 25,000 to 100,000 |
| Game Porting / Integration | 25,000 to 100,000 |
| 3rd Party Charges – PCB Fab, etc. | $50,000.00 |
| Firmware Maintenance/Support | |

EXHIBIT D
REVENUE SHARING

13

**EXHIBIT H**

# e.Digital
### c o r p o r a t i o n

| HOME | TECHNOLOGY PLATFORMS | OEM SERVICES | COMPANY | INVESTORS |

## SMART SOLUTIONS FOR A DIGITAL WORLD®
COMPREHENSIVE DIGITAL PRODUCT DEVELOPMENT

CORPORATE NEWS & PRESS RELEASES

03/31/06
SHAREHOLDER ALERT

## e.DIGITAL CORPORATION PROVIDES UPDATE ON STATUS OF 1250 UNIT DIGEPLAYER™ ORDER

(SAN DIEGO, CA, March 31, 2006) – e.Digital Corporation (OTC: EDIG), a leading innovator of secure digital video technology and products, and patented technology in the utilization of flash memory in portable devices provided an update today regarding the status of the 1250 unit digEplayer™ order placed by customer, digEcor, in November 2005. For more details and information regarding this order, please view the following link: www.edigital.com/shal032306.htm

Since the company became aware of information indicating that its long-time contract manufacturer, Maycom Co. Ltd. (Maycom) may be unwilling or unable to complete the fully-paid purchase order for product intended for delivery to digEcor, company officials have personally visited the offices of Maycom in Korea and held face-to-face meetings with its principal. During these meetings, the company became aware of discrepancies between what had been reported previously to the company regarding the progress of the order, by Maycom and by a report from a January 2006 onsite inspection commissioned by digEcor prior to final progress payments being made. These discrepancies have caused e.Digital to begin an investigation to determine if any third parties have interfered with the company's relationship with Maycom.

Throughout the meetings in Korea and in subsequent discussions, Maycom has assured e.Digital that it intends to fulfill its obligation under the purchase order. However, the company has yet to receive a definitive plan and timetable for such performance. Because of the uncertainty of Maycom's timely performance, e.Digital has engaged legal representation in Korea to pursue legal remedies with Maycom and its principal(s), and other third parties if warranted. The company intends to take all necessary action to compel Maycom to fulfill its obligations. e.Digital will provide further updates regarding this matter as they become available.

**About e.Digital Corporation:.** e.Digital Corporation specializes in the delivery, management, and protection of secure digital content through its proprietary technology platforms. Through customer and partnering relationships, e.Digital is a provider of secure portable Video on Demand products including the Company's proprietary eVU™. e.Digital's services include the licensing of the Company's MicroOS™, Content Mark-Up Language (CML) application, patent-pending hardware security technology, Digital Rights Management (DRM) solutions, and video display software applications. In addition, e.Digital partners with leading, innovative companies, designing and providing manufacturing services for products employing the Company's proprietary digital technology platforms. For more information about e.Digital and its technology platforms, please visit the company website at www.edigital.com.

**Safe Harbor statement under the Private Securities Litigation Reform of 1995:** All statements made in this document, other than statements of historical fact, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act. You should not place undue reliance on these statements. We base these statements on particular assumptions that we have made in light of our industry experience, the stage of product and market development, expected future developments and other factors that we believe are appropriate under the circumstances. These forward-looking statements are based on the then-current expectations, beliefs, assumptions, estimates and forecasts about the businesses of the Company and the industries and markets in which the company operates. These statements are not guarantees of future performance and involve risks, uncertainties that could cause actual results to differ materially from those suggested in the forward-looking statements, including but not limited to the Company's ability to finance its operations, sell its products, implement a turnkey financial, product, and maintenance solution, manufacture and ship orders in a timely manner, secure additional business, the Company's contract manufacturer's (Maycom) ability to timely fulfill the November 11, 2005 purchase order, and other risks identified and discussed in our filings with the Securities and Exchange Commission ("SEC"). Actual outcomes and results may differ materially from what is expressed or implied by the forward-looking statements. More information about potential factors that could affect the Company can be found in its most recent Form 10-K, Form 10-Q and other reports and statements filed with the Securities and Exchange Commission ("SEC"). e.Digital Corporation disclaims any intent or obligation to update these or any forward-looking statements, except as otherwise specifically stated by it.

**Note:** eVU and MicroOS are trademarks of e.Digital Corporation. All other company, product, and service names are the property of their respective owners.

**Press Contact:**
Robert Putnam
(858) 679-1504 ext.205
pr@edigital.com

TO RECEIVE e.DIGITAL SHAREHOLDER ALERTS, PRESS RELEASES AND GENERAL INFORMATION VIA EMAIL, CLICK THE LINK BELOW TO JCIN THE e.DIGITAL MAILING LIST.

e.Digital Mailing List

CONTACT e.DIGITAL

Copyright © 2005-2006, e.Digital Corporation, Inc.

HOME

%JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
digEcor, Inc.

**DEFENDANTS**
e.Digital Corporation

FILED
U.S. DISTRICT COURT

**(b)** County of Residence of First Listed Plaintiff   Utah
(EXCEPT IN U.S. PLAINTIFF CASES)

2006 MAY 31 P 3: 50

County of Residence of First Listed Defendant   San Diego
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.
DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
David W. Tufts (8736), Durham, Jones & Pinegar
111 E. Broad, Suite 900, Salt Lake City, UT 84111 (801) 415-3000

Attorneys (If Known)
James S. Jardine (1647), Rick B. Hoggard (5088), Ray Quinney &
Nebeker P.C., 36 S. State, #1400, Salt Lake City, UT 84111 801-532-

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** $1,000,000.00 plus

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
05/31/2006

SIGNATURE OF ATTORNEY OF RECORD
_Rick B. Hoggard_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____

Judge Ted Stewart
DECK TYPE: Civil
DATE STAMP: 05/31/2006 @ 15:50:49
CASE NUMBER:  2:06CV00437  TS