IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIGECOR, INC. a Washington corporation,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>E.DIGITAL CORPORATION, a Delaware corporation; DOES 1 to 20, individuals,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS<br><br><br><br>Case No. 2:06-CV-437 TS |

This matter is before the Court on Defendants' Motion to Dismiss Certain Claims in the Complaint,[1] Plaintiff's Motion for Partial Summary Judgment,[2] and Defendants' Motion for Judgment on the Pleadings as to the Scope of Exclusivity Under the DRM Agreement.[3]

---

[1]Docket No. 5.

[2]Docket No. 15.

[3]Docket No. 34.

1

## I.  FACTUAL BACKGROUND

The parties entered into a contractual relationship to manufacture and market in-flight entertainment devices.  In April 2002, the precursor company to Plaintiff entered into a nondisclosure agreement ("2002 NDA") with Defendants to explore the possibility of forming a long-term business relationship.  In October of 2002, pursuant to another contract ("2002 Agreement") the parties entered into a business relationship to design and manufacture a video device ("digEplayer") and various other products, including the eVU, a portable entertainment device derived from the design of the digEplayer.  The 2002 Agreement expired, by its own terms, on October 22, 2005.

In October of 2005, Plaintiff issued a Purchase Order ("PO") placing an order for 1,250 digEplayers to be delivered in January of 2006.  Very soon afterwards, the parties entered into a Digital Rights Management Program Services Agreement ("DRM Agreement").  The DRM Agreement provided for the DRM project, whereby Defendants would create and adapt digital rights management technology ("DRM technology") for Plaintiff's digEplayers.  The DRM Agreement granted Plaintiff an unrestricted license, upon payment of $25,000, to use the DRM technology for Plaintiff's digEplayer in the aircraft industry.  The DRM Agreement, as part of its terms, required Plaintiff to issue a purchase order for 1,250 digEplayers.  The Agreement states that Maycom, a Korean company, would manufacture the players.  Plaintiff made payments for the players in the amount of $793,750, either at, or, per the request of Defendants, before the contractually required intervals.  In late 2005, the parties discussed the need for Plaintiff to provide an airline name, logo, and color to be printed on the plastic cases of the digEplayers.

In early January of 2006, Plaintiff suggested that the Korean representative of its parent company inspect the manufacturing process.  The inspection took place as planned.  By March 1,

2

2006, Plaintiff had specified the color and logo of the cases. On March 14, 2006, Defendants informed Maycom that they were going to visit the Korean facility to assure the manufacture of the digEplayers. At that time, Defendants were informed that the units were not ready. In the interim, Defendants have allegedly produced and marketed their eVU player in the airline industry. Plaintiff brings claims of breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, intentional interference with prospective economic relations, punitive damages, and injunction against Defendants.

Defendants, after the filing of this action, delivered 1,250 units of the digEplayer during the week of October 30, 2006. Plaintiff now asserts that twenty-six of these units were defective and returned to Defendant. Plaintiff represents that the parties have reached a partial settlement, and that the delivery satisfies its claims to recover the purchase price paid for the units. The parties have stipulated that Plaintiff's acceptance of delivery does not limit its remaining claims, or Defendants' defenses. Plaintiff asserts that it now seeks to recover $94,846—the cost of Defendants' failure to make perfect tender (for the twenty-six units), and the cost of batteries for all of the 1,250 units.

## II. DISCUSSION

### A. Defendants' Motion to Dismiss Certain Claims in the Complaint

Defendants seek to dismiss all of Plaintiff's claims, except those for breach of contract, implied duty of good faith, and injunction, under contracts other than the 2002 NDA or 2002 Agreement, for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the

3

light most favorable to the nonmoving party.[4]   A Rule 12(b)(6) motion to dismiss may be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling it to relief under its theory of recovery.[5]   All well-pleaded factual allegations in the amended complaint are accepted as true and viewed in the light most favorable to the nonmoving party.[6]   But, the court "need not accept conclusory allegations without supporting factual averments."[7]   "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[8]

Defendants make several arguments in support of their Motion, including:  (1) Plaintiff's breach of contract, injunction, and other claims must be dismissed, as a matter of law, because the agreements upon which they are based, by their operation, are superseded or expired, (2) Plaintiff is only entitled to $25,000 of damages under the agreements, (3) Plaintiff's unjust enrichment claim must be dismissed because of the existence of express contracts between the parties, (4) Plaintiff's tort claims of fraud, negligent misrepresentation, tortious interference, and punitive damages are precluded by the economic loss doctrine, (5) Plaintiff has not set forth facts

---

[4]*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

[5]*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

[6]*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[7]*Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

[8]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).  Also, under Fed. R. Civ. P. 10(c), documents, including contracts, attached to a complaint or other pleading may be considered without converting the motion into one for summary judgment.

4

under certain elements of fraud and negligent misrepresentation, (6) Plaintiff has not stated a

claim for tortious interference based on an improper purpose or improper means, and (7) Plaintiff

has failed to state a claim for punitive damages.  The Court addresses each argument in turn.

       1.  Operation of Agreements

      Defendants argue that the 2002 NDA was superseded by the 2002 Agreement which has

now expired.  Defendants first point to the merger clause of the 2002 Agreement which states

that: "This Agreement constitutes the entire understanding and agreement between the parties

with respect to the transactions contemplated herein and supercedes any and all prior oral or

written communications with respect to the subject matter herein."  Defendants assert that

Plaintiff's claims relate to the broad subject matter contemplated by the 2002 Agreement,

namely, portable video devices for in-flight entertainment, and, more broadly, the entire business

relationship between the parties.  Defendants then emphasize that, because, by its own terms, the

2002 Agreement expired on October 22, 2005, Plaintiff cannot seek damage or injunctive relief

under the 2002 Agreement for Defendant's design or marketing of the eVU.

      Plaintiff counters that the 2002 Agreement does not supersede the 2002 NDA, and that,

even if it did, its claims survive under the DRM Agreement's exclusivity provision.  Plaintiff

emphasizes that the 2002 NDA's non-competition provision lasts "for a period of seven (7) years

after the termination of this agreement."  Plaintiff also argues that the 2002 Agreement's merger

clause is limited to "the transactions contemplated [t]herein[,]" which, as defined by the 2002

Agreement, constituted the "develop[ment by e.Digital] of a portable video device for Alaska

Airlines."  Plaintiff further argues that the 2002 NDA related to the disclosure of its prototypes,

drawings, data, trade secrets, and intellectual property to Defendant, which represents a different

transaction, and differing subject matter.

Plaintiff also argues, in the alternative, that the expiration of the 2002 Agreement did not put an end to the Defendants' non-competition obligation.  In so doing, Plaintiff emphasizes that the 2002 Agreement states that

> [n]otwithstanding the termination or expiration of this Agreement the obligations of the parties under Article I (Non-Disclosure) as well as under any other provision of this Agreement, which by their nature, are intended to survive termination or expiration will survive and continue enforceable.

Plaintiff further argues that Paragraph J.2 of the 2002 Agreement precludes Defendant from marketing a player similar to the digEplayer, and that the provision survived termination of the 2002 Agreement.  Paragraph J.2 states that

> [i]f for any reason [Plaintiff] decides not to proceed with the production of the designed product and/or is default on its payment terms & conditions to [Defendant], [Defendant] shall have free and unrestricted access to market the design.  If for any reason [Defendant] decides not to proceed with the project, it is agreed that [Plaintiff] shall have free and unrestricted access to all designs and intellectual property incorporated into the product design and/or developed up to that point without payment of royalty to [Defendant] for its intellectual property used in this product.

Finally, Plaintiff contends that whether the parties intended the 2002 Agreement to supersede the 2002 NDA is at least ambiguous and even if it cannot proceed with its claims under the 2002 NDA and 2002 Agreements, it can under the DRM Agreement.

The Court finds, as a matter of law, that the 2002 Agreement does not supersede the 2002 NDA.  Specifically, the Court finds that the merger clause of the later agreement does not alone allow it to supersede the obligations under the prior one.  In *Ford v. American Express Financial Advisors, Inc.*,[9] the Utah Supreme Court addressed the effect of a merger clause, very similar to the one in this case, on a prior agreement.  Citing the Sixth Circuit, the *Ford* court stated that

_____

[9]2004 UT 70, 98 P.3d 15.

6

> [t]he integration provision simply means that the entire agreement between the parties concerning the subject matter [t]hereof—that is, concerning [the defendant's] new association with [the plaintiff] after [the date of the later agreement]—consists of [the later written agreement and its various attachments]. [T]he statement that the [later agreement] supersedes all prior and contemporaneous agreements . . . merely limits what we can evaluate when determining the parties' intent for the [later agreement].  It says nothing about relieving [the defendant] of the obligations it had already incurred under the [previous agreement].[10]

This is also supported by New York law, which, according to its choice of law provision, governs the 2002 Agreement.[11]  For the purposes of the Motion at hand, the Court need not address the expiration of the 2002 Agreement, or survival of the provisions in Paragraph J.2.

### 2.  Limit on Damages

Defendants assert that Plaintiff's recovery under the Purchase Order and the DRM is limited to $25,000.  The Court notes that Defendants' argument concerning the limitation of damages under the DRM Agreement is not appropriately addressed in a motion to dismiss because Defendants, in essence, ask the Court to affirmatively rule on a specific sub-issue within Plaintiff's causes of action, not to dismiss any of Plaintiff's claims.  Defendants' requested remedy would be tantamount to this Court rendering a declaratory judgment on this issue, and the Court will not do so.

### 3.  Unjust Enrichment

Defendants argue that Plaintiff's unjust enrichment claims must be dismissed because of the existence of express contracts between the parties.  Plaintiff responds that it has properly

---

[10]*Id.* at ¶ 23-24 (internal citation omitted).

[11]*See, e.g., Exhibitgroup/Giltspur, Inc., v. Spoon Exhibit Services*, 273 A.D.2d 874, 874 (N.Y. App. Div. 2000) ("The prior agreements or understandings referred to in the merger clause are only those prior agreements or understandings that a party would be precluded from proving by operation of the parol evidence rule.").

alleged unjust enrichment as an alternative cause of action, and supported the elements with facts.

"A proper claim for unjust enrichment requires that the party show (1) a benefit conferred on one person by another, (2) an appreciation or knowledge by the conferee of the benefit, and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[12] "Recovery under an unjust enrichment theory is available only when no enforceable written or oral contract exists."[13]  More specifically, "[r]ecovery in quasi contract is not available where there is an express contract covering the subject matter of the litigation."[14]

The Court dismisses Plaintiff's unjust enrichment claim because of the existence of express contracts between the parties.  Here, while disagreeing about which contracts govern, and how they do so, both parties argue that the subject matter of this action is covered by express contracts.

4.   The Economic Loss Doctrine

Defendants allege that Plaintiff's claims for fraud, negligent misrepresentation, tortious interference, and punitive damages arise from duties expressed in, or subsumed by, the express agreements between the parties, and are barred by the economic loss doctrine.

Plaintiff contends only that its fraud claim may proceed in light of the economic loss doctrine because Defendant violated a "common law duty" in order to induce Plaintiff to make

---

[12]*Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 34, 84 P.3d 1154.

[13]*Wood v. Utah Farm Bureau Ins. Co.*, 2001 UT App 35, ¶ 10, 19 P.3d 392.

[14]*Mann v. Am. Western Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978).

payments that were not yet due under the parties' contract.  Plaintiff cites *Grynberg v. Questar Pipeline Co.*[15] for the proposition that Utah law allows a party to a contract to bring a tort claim against the other party as long as the tort involves the breach of a common law duty that exists independently of the contractual duties.  Plaintiff also indicates that the PO does not require Defendants to make any disclosures regarding the status of the order.

The economic loss rule marks the boundary between contract law, arising out of agreement, and tort law, imposed by society.[16]  In Utah, the "formulation of the economic loss rule is that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."[17]  "Therefore the initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties."[18] If there is no independent duty, then "[a]ll contract duties, and all breaches of those duties—no matter how intentional—must be enforced pursuant to contract law."[19]

The Court dismisses Plaintiff's claims for fraud, negligent misrepresentation, tortious interference, and punitive damages because it finds that they are barred by the economic loss rule.  Except for its fraud claim, Plaintiff makes no effort to argue that its tort claims should proceed despite the rule. With respect to the fraud claim, Plaintiff does not make any argument to

---

[15]2003 UT 8, 70 P.3d 1.

[16]*Hermansen v. Tasulis*, 2002 UT 52, ¶ 13, 48 P.3d 235.

[17]*Id.* at ¶ 16.

[18]*Id.* at ¶ 17.

[19]*Grynberg*, 2003 UT 8, at ¶ 48 (applying Wyoming law).

establish an independent tort duty of care.  Rather, Plaintiff vaguely asserts a common law duty related to fraud, and implies that Defendants' alleged fraudulent actions do not overlap with the parties' bargained-for duties, and therefore, do not fall within the ambit of the rule.  However, the Court finds that Plaintiff's fraud claim relates to the already bargained-for contractual duties of the parties, specifically, for Plaintiff to make specific payments, and for Defendants to provide a product.  Regardless of the timing of the payments, the duty to pay arose from, and was not independent of the contracts at issue.  In making this finding, the Court is "influenced by the nature of the parties and contracts at issue: here are two sophisticated business parties agreeing to buy and sell goods in a commercial contract.  Strict application of the economic loss doctrine is even more appropriate in cases involving the Uniform Commercial Code."[20]

Because Plaintiff's tort claims are dismissed under the economic loss rule, the Court need not address the parties' arguments on whether Plaintiff has missing elements in its claims of fraud and negligent misrepresentation, whether Plaintiff fails to state a claim for tortious interference based on an improper purpose or improper means, and whether Plaintiff fails to state a claim for punitive damages.

*B.  Plaintiff's Motion for Partial Summary Judgment on Liability and Damages*

Plaintiff moves for summary judgment on the issues of liability and general damages caused by Defendants' alleged breach of the PO.  Significantly, Defendants point out that, to date, no discovery has been conducted in this action.[21]

---

[20]*Id.* at ¶ 53.

[21]While Defendants assert that they are entitled to discovery on the issues of liability and general damages under Fed. R. Civ. P. 56(f), they have filed no motion under the rule, and have not set forth an affidavit identifying the facts that are not available, and what steps they have

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[22]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[23]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[24]  Importantly, "[s]ummary judgment should not be granted 'where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'"[25]

The elements of a breach of contract claim under the PO are: (1) the existence of a contract, (2) performance by Plaintiff, (3) nonperformance by Defendant, and (4) damages.[26]

Plaintiff asserts that the existence of the PO is undisputed.  Plaintiff contends that it performed under the PO by paying Defendants the full $793,750 purchase price.  Plaintiff also contends that Defendants admitted that they did not perform under the PO in a Form 8-K ("the

---

taken to obtain them.  *See Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992).  However, under these circumstances a district court still has discretion to deny a motion for summary judgment.

[22]Fed. R. Civ. P. 56(c).

[23]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[24]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);  *Wright v. Southwestern Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

[25]*Campbell*, 962 F.2d at 1521 (quoting *Anderson*, 477 U.S. at 257).

[26]*Mackey v. Cannon*, 2000 UT App 36, ¶ 13, 996 P.2d 1081.

Form") released to the public on March 23, 2006, wherein Defendants asserted that their subcontractor, Maycom, had not provided the units to Defendants and, as a result of this, Defendants were unable to deliver under the PO. Plaintiff emphasizes that the Form indicates that Defendants could be obligated to Plaintiff in the amount of approximately $790,000. Finally, Plaintiff asserts that it has suffered general damages in the amount of at least $793,750, now reduced to $94,846 pursuant to the partial settlement agreement between the parties.

Defendants make the following arguments to counter Plaintiff's Motion: (1) Maycom, not Defendants, was contractually obligated to deliver the digEplayers; (2) Defendants did not breach the PO because Maycom's failure to deliver was beyond Defendants' reasonable control; (3) Plaintiff did not perform its obligations under the contract, and contributed to the breach; (4) Defendants' liability under the DRM Agreement is limited to $25,000; and (5) it would be premature to determine whether, and to what extent, Plaintiff has mitigated its damages.

The Court will deny Plaintiff's Motion for Partial Summary Judgment on the issue of liability and general damages. The motion is premature as there has been no discovery in this action. Moreover, Defendants have established by affidavit and other evidence that there are genuine issues of material fact, including whether Plaintiff performed under the contracts and whether Plaintiff contributed to any breach of the contracts.

 *C. Defendants' Motion for Judgment on the Pleadings as to the Scope of Exclusivity Under the DRM Agreement*

 Defendants move for judgment on the pleadings on the issue of the scope of Plaintiff's exclusive rights under the DRM Agreement.

 A motion for judgment on the pleadings applies the same standard as a 12(b)(6) motion to dismiss.[27]  Therefore, the court should accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in the favor of the same.[28]  "Judgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"[29]

 The DRM Agreement states that

> [Plaintiff] will pay [Defendants] a $25,000 one-time flat fee for an unrestricted, unlimited, irrevocable right to use the DRM technology for use on the [Plaintiff] digEplayer and other [Plaintiff] products . . . . With regard to the DRM technology, the aircraft industry will be an exclusive license for [Plaintiff] and all other markets will be non-exclusive.

Defendants argue, and Plaintiff concedes, that DRM technology is defined in the first paragraph of Addendum One of the DRM Agreement ("Addendum Paragraph"), which states,

> The details of the DRM project are set forth in Addendum One.  The Addendum One document was provided by [Defendant] and sets forth a text description and schematic representation of the DRM technology.  The Parties agree that Addendum One will govern the DRM Project and that any changes or modifications from what is specifically set forth in Addendum One must be approved in writing by both Parties.

---

[27]*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).

[28]*Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

[29]*Id.*

The Addendum Paragraph establishes that DRM technology is defined by "three categories as follows: physical security[,] encoding[, and] digital security[:]"

> Physical security . . . is the means by which the physical media containing the content is protected.  Logs, procedures, and safes typically address this type of protection.  Encoding [is] [s]ecurity that is implemented during the encoding process, . . . as proprietary file containers and bit stream format.  Digital Security . . . is applied in the form of encryption algorithms.

The remainder of Addendum One—more specifically, six of the nine pages of the agreement—sets forth the various components of the defined technology, as they fall under each of the above-mentioned categories.[30]

Defendants specifically argue that DRM technology requires, among other things, the use of random block encoding ("RBE").  RBE is specifically described on pages five and six of Addendum One.  Defendants assert they are entitled to produce and sell any technology that does not use RBE because such technology is not DRM technology, and thus, would not run afoul of Plaintiff's exclusive rights under the DRM Agreement.

Plaintiff argues that, by the plain language of the Addendum Paragraph, DRM technology includes many components in addition to RBE, such that Defendants are not automatically entitled to produce technology which differs from the DRM technology only in that it does not utilize RBE.  Without directly stating so, Plaintiff implies that the DRM Agreement is ambiguous as to what constitutes DRM technology.  Plaintiff further argues that, in entering the DRM Agreement, the parties intended that Plaintiff should have exclusive rights in the airline industry to all of the various components found in the Agreement.  To support this argument, Plaintiff references extrinsic evidence outside of the pleadings and requests that the Court

---

[30]A list of the additional components is set forth in more detail in Plaintiff's Mem. in Opp, Docket No. 43, at 2-3.

address Defendants' Motion as one for summary judgment.[31]  In short, Plaintiff appears to argue that simply by changing one small part of DRM technology, Defendants do not create non-DRM technology, thus evading Plaintiff's exclusive rights to the technology.

Defendants reply that Plaintiff, in effect, incorrectly seeks an interpretation which would grant Plaintiff exclusive rights to each component in the Addendum Paragraph.  Defendants assert that the proper construction would grant Plaintiff the right only to the combination of the essential, proprietary components of the DRM technology.  In connection with this argument, Defendants contend that some of the individual components of the DRM technology to which Plaintiff seeks an exclusive right are non-proprietary, and therefore, Defendants are in no position to have granted an exclusive license of the scope Plaintiff asserts.  Therefore, Defendants contend, to the extent that Plaintiff has rights to individual components of the DRM technology, at least the non-proprietary components are excluded from Plaintiff's proffered definition of the technology.  Accordingly, Defendants propose that the Court rule, alternatively, that exclusivity is no broader than the proprietary features in Addendum One, deferring the determination of whether such exclusivity extends to the elements in combination or severally until later in the case.

_____

[31]For example, Plaintiff argues that its presentation of all of the elements of DRM technology to the studios as a package, supports a broad interpretation of DRM technology. Plaintiff has attached an affidavit in support.  Plaintiff also argues that Defendants' proposed interpretation of the former's exclusive rights is incorrect and/or that, to the extent that Defendants assert they have changed the DRM technology for use in its eVU, any such change is illusory.  Plaintiff asserts that Defendants are marketing their eVU, which the latter allege uses different technology as that used by the digEplayer, as studio-approved and Hollywood-certified. Plaintiff has submitted Defendants' advertisements in support.

"In construing a contract, the intention of the contracting parties is controlling."[32]  "If the

language within the four corners of the contract is unambiguous, the parties' intentions are

determined from the plain meaning of the contractual language, and the contract may be

interpreted as a matter of law."[33]  However, a contract may be ambiguous because it is unclear, it

omits terms, or "'the terms used to express the intention of the parties may be understood to have

two or more plausible meanings.'"[34]  "In determining whether a contract is ambiguous the court

is not bound to consider only the language of the contract [but] any relevant evidence must [also]

be considered."[35]  If the Court deems a contract to be ambiguous, "there is a factual issue as to

what the parties intended[,]" and the Court may not rule as a matter of law.[36]

The Court finds, as a matter of law, that the DRM Agreement is unambiguous in setting

forth RBE as one necessary component of DRM technology, as that term is defined by the

Agreement, and that the parties here have chosen to define DRM technology as the sum of its

component parts.  As discussed in further detail below, the DRM Agreement is not unclear, does

not omit terms, and does not contain terms with two or more plausible meanings on the issue in

---

[32]*Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 18, 48 P.3d 918.  The DRM Agreement does not contain any choice of law provisions, and the parties have not argued, or set forth any facts as to whether any particular state's law is applicable.  In the absence of other facts or arguments, the Court construes the DRM Agreement as being governed by Utah law under the "most significant relationship" test.  *See Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 888 (10th Cir. 1991) (applying test).

[33]*Saleh v. Farmers Ins. Exchange*, 2006 UT 20, ¶21, 133 P.3d 428.

[34]*Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993).

[35]*Peterson*, 2002 UT 43, at ¶¶ 18-19; *see also Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 832 (10th Cir. 2005).

[36]*WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139.

dispute.  Therefore, the Court ascertains the parties' intentions from the plain meaning of the contractual language.  Furthermore, the Court makes this determination without considering evidence outside the pleadings, and, accordingly, declines to convert Defendants' Motion into one for summary judgment.[37]

The Court finds that, by the plain language of the DRM Agreement, the parties here have chosen to define DRM technology as the sum of its component parts.  The DRM Agreement specifically states that Addendum One constitutes the text description and schematic representation of DRM technology, as that term appears in the Agreement.  While the contract grants to Plaintiff the right to modify and add to the DRM technology at its discretion, there is no indication from the language of the Agreement that the parties intended that any lesser combination of the components of the technology could still constitute DRM technology, as defined by the Agreement, or that Plaintiff's exclusivity rights would extend to such.  To the contrary, the parties specifically set forth "that any changes or modifications from what is specifically set forth in Addendum One must be approved in writing by both parties."

Also, Plaintiff's argument that removing RBE from DRM technology is not a sufficient enough change to remove Defendants' technology from the scope of Plaintiff's exclusive right under the agreement is unconvincing.  As is demonstrated by its relatively extensive mention in Addendum One, RBE is a substantial component of DRM technology.  Finally, while the contracting parties, who are sophisticated business entities, could have chosen either to define DRM technology, and hence, Plaintiff's exclusivity rights, so as to allow for the severability of

---

[37]The Court notes that it does not believe that the extrinsic evidence offered is relevant to the issue of whether the DRM Agreement is ambiguous.

various components of the technology, or to grant Plaintiff exclusive rights as to any technology substantially similar to the described DRM technology, they did not do so.

Accordingly, the Court finds, as a matter of law, that Plaintiff's exclusivity rights are limited to technology which, among the other components listed in Addendum One, includes RBE.  The Court further finds that the DRM Agreement defines DRM technology as the sum of its component parts, as set forth in Addendum One, and not severally as to each component.

## III.  CONCLUSION

For the above-mentioned reasons, it is hereby

ORDERED that Defendants' Motion to Dismiss (Docket No. 5) is GRANTED IN PART and DENIED IN PART.  Defendants' Motion is DENIED as to the dismissal of any breach of contract or other claims upon the basis that the 2002 NDA is superseded by the 2002 Agreement. Defendants' Motion is also DENIED as to the issue of limitation of damages under the DRM Agreement.  The Motion is GRANTED as to the dismissal of Plaintiff's unjust enrichment and other tort claims.  It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 15) is DENIED. It is further

ORDERED that Defendants' Motion for Judgment on the Pleadings (Docket No. 34) is GRANTED.

DATED   January 19, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge