IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIGECOR, INC., a Washington corporation,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>E.DIGITAL CORPORATION, a Delaware corporation; et al.,<br><br>Defendants. | ORDER and MEMORANDUM DECISION<br><br><br><br>Case No. 2:06-CV-437 CW |

Plaintiff digEcor, Inc. markets portable digital viewers to various service industries, including the airlines.  digEcor's viewers allow airline passengers to, among other things, interactively view Hollywood movies in flight.  e.Digital Corporation markets similar viewers to the airlines and directly competes with digEcor for airline clients.  Before e.Digital became a competitor of digEcor, e.Digital was the original equipment manufacturer, or OEM, of the first viewer digEcor marketed.  This case involves disputes spanning the entire relationship between digEcor and e.Digital, from the initial contact between digEcor and e.Digital, to their business relationship, to their current rivalry.  The parties have brought various claims and counterclaims against each other.  Now before the court are cross-motions by digEcor and e.Digital seeking summary judgment or partial summary judgment on each of their claims.

**BACKGROUND**

In around April 2002, William Boyer of Airline Protective Services ("APS") approached Steve Ferguson of e.Digital by telephone.  At that time, Mr. Boyer and APS were located in

Washington and Mr. Ferguson was located in California.  Mr. Boyer told Mr. Ferguson that he

had an idea for a product, but that Mr. Boyer wanted e.Digital to sign a confidentiality and non-

compete agreement before he revealed the idea.  Mr. Ferguson agreed in principle and Mr. Boyer

and others at APS drafted an agreement.

APS's original draft agreement contained an open-ended promise not to compete with

APS or Mr. Boyer on products relating to the idea.  Mr. Ferguson did not accept an unlimited

non-compete period and, after negotiating, he and Mr. Boyer compromised on a term of seven

years.  After reaching an agreement on all of the relevant terms, Mr. Boyer and Mr. Ferguson

signed a "Non-Disclosure Agreement" (the "2002 NDA") on April 2, 2002.  The 2002 NDA's

non-compete clause states as follows:

> 6.  Non-Competition: RECIPIENT agrees not to compete with APS, Inc. directly or
> indirectly during the term of this Agreement and for a period of seven (7) years after the
> termination of this agreement anywhere in the world by years after termination of this
> agreement anywhere in the world by manufacturing and/or selling like or similar
> components: (any and all components that APS, Inc. and manufactured, designed, etc.[1]

(2002 NDA, ¶ 5, attached as Ex. 4 to digEcor's Memo. in Support.)  Three other clauses also

contained agreements relating to e.Digital's ability use the information.  Those clauses state as

follows:

> 1.  [e.Digital agrees] [n]ot to use the information herein except for evaluating its interest
> in entering a business relationship with [Mr. Boyer/APS] . . .

> 4.  That [e.Digital] shall not directly or indirectly acquire any interest in, or design, create
> manufacture, sell or otherwise deal with any item product, containing, based upon or
> derived from the information, except as may be expressly agreed to in writing by [Mr.
> Boyer/APS].

---

[1] All provisions of the 2002 NDA quoted herein are exactly as they appear in that
agreement, including apparent grammatical errors and confusing phrases.

> 5.  It is understood and agreed that the subject matter and information being disclosed, and all novel aspects thereof, shall not be used commercially, nor otherwise to others by [e.Digital], either directly or indirectly, without the express prior written consent of [Mr. Boyer/APS].

(Id. ¶¶ 1, 4 and 5.)

Mr. Boyer signed the 2002 NDA in Washington, and Mr. Ferguson signed it in California.  After agreeing to the 2002 NDA, Mr. Boyer revealed his idea to Mr. Ferguson.  In short, Mr. Boyer envisioned creating a portable viewing device for use on airplanes, with Alaska Airlines as his first potential customer.  The viewer's hard drive was to be encrypted and loaded with Hollywood movies that had not yet been released for rental by the public.  Mr. Boyer explained the essentials of this concept over the phone.  During that conversation, Mr. Boyer was in Washington and Mr. Ferguson was in California.

Following the initial telephone calls, Mr. Boyer traveled to e.Digital's offices in California.  There, Mr. Boyer and e.Digital discussed a possible relationship with e.Digital to develop a product based on the idea.  On October 22, 2002, e.Digital and APS signed a second agreement (the "October 22 Agreement").  Generally, the October 22 Agreement memorialized e.Digital's agreement to design and oversee the manufacture of the portable viewer and APS's agreement to use "e.Digital's technologies and have e.Digital develop a portable device . . . for Alaska Airlines."  The October 22 Agreement included a non-disclosure provision, but did not include a non-compete provision.  It made no reference to the 2002 NDA, but did include an integration clause stating that it "supercedes any and all prior oral or written communications with respect to the subject matter herein."  (October 22 Agreement § Q, attached as Ex. 7 to digEcor's Memo. in Support.)

Two sections of the October 22 Agreement are in dispute here.  First is Section B, which states that:

> In accordance with the Statement of Work, hereinafter described, e.Digital shall develop, complete and deliver to APS a detailed functional specifications document ("Functional Specifications") setting forth the functional capabilities and requirements of the Products contemplated under this Agreement.  APS shall accept or reject the Functional Specifications within ten (10) business days of receipt thereof. . ."

(Id. at § B.)  The second disputed section is in Section C, which reads as follows:

> Exhibit D shall contain revenue sharing for future markets, customers and/or added enhancements of peripherals and services for this device.  Both parties agree to work in good faith to negotiate a revenue split on products built from the initial platform which is developed for this IFE system.

(Id. § C.)  Exhibit D to the October 22 Agreement was left blank and the parties acknowledge that the terms contemplated to be set forth in Exhibit D were never agreed upon.

In late 2003, Wencor Corporation acquired APS and renamed it digEcor, Inc.  In the Fall of 2003, digEcor unveiled its first viewer, the digEplayer 5500, at a trade show.  digEcor also announced its first customer, Alaska Airlines.  digEcor's marketing strategy was to make the devices available for lease or sale directly to airlines, which would then rent them to passengers.  Until about late 2005 e.Digital provided thousands of digEplayer 5500s to digEcor, which sold them to various airlines.  e.Digital contracted with Maycom, a Korean company, to manufacture the digEplayer 5500s ordered by digEcor.

In October 2005, digEcor announced that it had contracted with a new OEM, Triad Engineering Systems, to design the digEplayer XT, digEcor's planned successor product to the digEplayer 5500.  (See Ex. 97 to e.Digital's Memo. in Opp'n.)  digEcor selected Wolf Electronix as the manufacturer for the digEplayer XT.  (See id.)

On November 11, 2005, e.Digital accepted a purchase order ("PO") that digEcor had

signed on October 31, 2005.  The PO called for e.Digital to provide 1250 digEplayer 5500s and

1250 Li-on batteries.  The PO also provided for the purchase of 750 digEplayer 5500s and

batteries at an unspecified time.  Under the PO, digEcor was to make a 25% payment upon

ordering, a 25% payment 30 days prior to shipping, and a 50% payment at the time of shipment.

The "ship date" for the viewers and batteries was listed as January 10, 2006.  The PO was made

"contingent on reaching agreement on DRM terms."  (PO, attached as Ex. 55 to e.Digital's

Memo. in Opp'n.)  digEcor included a sheet of terms of conditions with the PO, but e.Digital

rejected those terms and conditions.

Also on November 11, 2005 digEcor and e.Digital signed a Digital Rights Management

Engineering Agreement ("DRM Agreement").  In general, the DRM Agreement governs the

terms of e.Digital's provision of digital rights management technology to digEcor.  Three

sections of the DRM Agreement are at issue here.  The first is Paragraph 5, which states that:

> As part of this Agreement, DIGECOR will place an order for 2000 units with 1250 units
> deliverable immediately.  The parties understand that Maycom will produce the 1250
> units, with payment terms as listed on the purchase order. . .  DIGECOR and EDIGITAL
> will work together to place the remaining order with another contract manufacturer, such
> as Wolf Electronix, at DIGECOR's discretion.

(DRM Agreement ¶ 5, attached as Ex. B to Dkt. No. 84.)  The second part of the DRM

Agreement in dispute here is Paragraph 11(c)'s limitation on damages "for any and all claims

concerning the DRM project."  (Id. ¶ 11(c).)  Finally, the agreement contains a *force majeure*

clause, excusing failure to meet obligations "due to any cause beyond the party's reasonable

control."  (Id. ¶ 12(a).)

On November 14, 2005, e.Digital asked digEcor to identify the color and airline logos for the 1250 digEplayer 5500s.  After declining to specify those items by the original shipment date of January 20, 2006, digEcor gave a firm response on March 2, 2006, when it indicated that it would accept black viewers with no logos.  Soon after, e.Digital informed Maycom of these specifications.  Maycom's March 14, 2006 response to e.Digital was that none of the digEplayer 5500s were ready.  Maycom further informed e.Digital that none of the digEplayer 5500s would be ready in the near future because Maycom was in financial trouble and had used the funds advanced to meet other commitments.

e.Digital immediately informed digEcor of this response.  e.Digital then took several measures to try to get Maycom to complete the order.  Eventually, e.Digital provided the majority of the digEplayer 5500s to digEcor in November, 2006.  digEcor contends that it lost at least two airline customers while it was waiting for delivery of the digEplayer 5500s.

Since digEcor's entry in the market with the digEplayer 5500, a number of other companies have entered the market with competing viewers, some with more advanced technology.  The digEplayer XT competes with these new entities' products, though digEcor still actively markets the digEplayer 5500 when it is feasible to do so.  In the Spring of 2006, e.Digital decided to market its own competing portable device to airlines, which it named the eVu. digEcor contends that e.Digital's marketing efforts have resulted in confusing actual and potential airline customers between the digEplayer 5500 and the eVu.  Meanwhile, e.Digital contends that digEcor wrongly interfered with e.Digital's marketing efforts by making false statements to the airlines, mostly about the present action.

In May 2006, digEcor sued e.Digital in Utah state court.  e.Digital removed to this court on May 31, 2006 and has filed counterclaims.  The procedural history of this case has been circuitous, with both parties amending their claims and filing various dispositive motions that have been resolved prior to the present motions.  As the case currently stands, digEcor's operative claims against e.Digital are (1) breach of the 2002 NDA, (2) breach of the October 22 Agreement, (3) breach of the duty of good faith and fair dealing, (4) Lanham Act violations and (5) common law and statutory unfair competition.  (digEcor also brings its Lanham Act and unfair competition claims against William Blakeley and Fred Falk, two individuals associated with e.Digital.)  e.Digital's remaining counterclaims against digEcor are (1) breach of contract, (2) tortious interference and (3) defamation.

Now before the court are motions by both parties for summary judgment and partial summary judgment on all of their operative claims.  The parties have also made various motions related to the summary judgment motions.  As stated at the hearing on these motions, the court will not decide the motions relating to claims for breach of the duty of good faith and fair dealing, the Lanham Act, unfair competition, tortious interference and defamation claims in this Order.  A hearing on those issues will be held on the date set out below.  Of the related motions, the court will only address two at this time: e.Digital's motion for a continuance and digEcor's motion to strike e.Digital's concordance.

## ANALYSIS

### I.      Summary Judgment Standards

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law."  Faustin v. City & County of Denver, Colo., 423 F.3d 1192, 1198 (10th Cir. 2005) (citations and internal quotation marks omitted).  See also Fed R. Civ. P. 56(c).  "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented."  Chasteen v. UNISIA JECS Corp., 216 F.3d 1212, 1216 (10th Cir. 2000).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## II.    Claims Regarding the 2002 NDA

Both parties assert that they are entitled to summary judgment on their claims related to Paragraphs 1, 4, 5 and 6 of the 2002 NDA.  digEcor seeks a judgment that those provisions are enforceable under Washington law and that e.Digital has breached them by marketing the eVu.  In response, e.Digital contends that those clauses are either unenforceable *per se* or are too indefinite and excessive to be enforced.  As to its first point, e.Digital contends that California law applies to the 2002 NDA and that California's Business and Professions Code § 16600 invalidates Paragraphs 1, 4, 5 and 6.  On the other hand, if Washington law applies, e.Digital argues that the clauses are unreasonable and therefore unenforceable as written.  Alternatively, e.Digital asserts that even if these provisions are enforceable, e.Digital has not breached them.

For the reasons below, the court rules that California law applies to the 2002 NDA.  Further, the court holds that Paragraphs 1, 4, 5 and 6 of  2002 NDA are invalid under California law because they refrain e.Digital from lawfully competing with digEcor.  Summary judgment

8

against digEcor and in favor of e.Digital on their claims regarding those provisions of the 2002 NDA is therefore appropriate.

    **A.    Utah Choice of Law Analysis**

    A federal court sitting in diversity applies the choice of law principals of the forum state. See Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc., 390 F.3d 684, 692 (10th Cir. 2004). As explained by the Tenth Circuit, when considering which state's law to apply to a contractual dispute:

> Utah courts "apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance." In contract disputes, courts consider (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Id. at 693 (citations omitted). These contacts are to be taken into account when applying the Restatement (Second) Conflict of Laws § 6, which "outlines choice-of-law principles for courts to follow." Morris v. Health Net of Cal., Inc., 988 P.2d 940, 941 n.4 (Utah 1999). Under § 6, courts consider:

> (a) the needs of the interstate and international systems,

> (b) the relevant policies of the forum,

> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

> (d) the protection of justified expectations,

> (e) the basic policies underlying the particular field of law,

> (f) certainty, predictability and uniformity of result, and

> (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2).

Here, Mr. Boyer signed the 2002 NDA in Washington and e.Digital signed in California. The negotiations occurred in both Washington and California. The performance occurred in two states: Mr. Boyer was to disclose the information, at least in part, in Washington, and e.Digital was to keep its promises in California.[2] The confidential information, to the extent it had a "location," would be kept in Washington and California. Mr. Boyer and APS were Washington residents, while e.Digital is a Delaware corporation based in California. These contacts do not appear to strongly favor either state, but the overall nature of the contacts leans toward California. For example, Mr. Boyer had a one-time duty to reveal the information in Washington, while the longer-lasting performance– keeping the information confidential and potentially not competing– was placed on e.Digital, which was in California. Moreover, Mr. Boyer reached out to a California company to initiate the contracting process in this case. Consequently, California has more significant contacts with the 2002 NDA than does Washington.

With this in mind, the court considers § 6. The parties' strongest arguments concerning § 6 center on two factors: the interests of the states and the justified expectations of the parties. digEcor argues that is apparent from the face of Paragraphs 1, 4, 5 and 6 of the 2002 NDA that the parties expected that e.Digital would not be allowed to compete with digEcor. Moreover, digEcor places emphasis on the fact that the parties specifically negotiated the length of the non-

_____

[2] Because the court finds that the non-compete provision is unenforceable under California law, the court does not reach the question of whether the information disclosed met the necessary requirements to be entitled to protection as confidential information.

compete clause, showing an expectation that it would be enforceable.  digEcor further highlights the 2002 NDA's statement that the parties "agree that the terms and provisions of [the 2002 NDA] are valid and binding at all times."  (2002 NDA, ¶ 7, attached as Ex. 4 to digEcor's Memo. in Support.)  Invalidating the non-compete clause under California law, argues digEcor, would frustrate the parties' justified expectation that e.Digital made a valid and binding commitment not to compete with digEcor in the market for products based on the idea.

e.Digital counters that California has a fundamental interest in preventing the enforcement of non-competition clauses against its residents.  e.Digital collects various cases finding that § 16600 reflects a strong public policy of California.  For example, in Application Group, Inc. v. Hunter Group, Inc., 72 Cal. Rptr. 2d 73, 84-85 (Cal. App. Ct. 1998), the California state appellate court found that § 16600 reflected a fundamental interest and strong public policy of California.  In Mailboxes Etc., USA, Inc. v. Considine, 229 F.3d 1158, *1 (9th Cir. 2000) (table opinion), the Ninth Circuit noted that "it is a fundamental policy of California to find [covenants not to compete] unenforceable."  And in Armed Forces Comm'ns, Inc. v. Cass Comm'ns, Inc., 60 F.3d 832, *1-*2 (9th Cir. July 5,1995) (table opinion), the court upheld a district court's decision to apply California law to a contract despite that fact that the contract contained an Illinois choice of law clause in part because of California's strong public policy as embodied in § 16600.  According to e.Digital, cases such as these support its assertion that California's interest substantially outweighs any expectation the parties had about whether the provisions at issue were enforceable.

After reviewing the relevant case law, the court agrees with e.Digital.  As explained by the Tenth Circuit, "[a]lthough the parties may have expected the covenants [not to compete] to be

enforced, the policy of protecting justified expectations does not supersede all other considerations."  Dresser Indus., Inc. v. Sandvick, 732 F.2d 783, 787 (10th Cir. 1984).  Dresser is instructive here.  In Dresser, a company attempted to enforce covenant-not-to-compete clauses against several former employees who were residents of various states.  As it happened, each of the states where the ex-employees resided did not enforce covenants not to compete.  Texas, where the employer was located, did enforce such contracts if they were reasonable.  The Tenth Circuit reasoned that the various states' interest in voiding covenants not to compete was greater than the parties' expectations about the covenants.  See id.

Dresser's logic applies here.  The parties' expectations are important, but not paramount, particularly in the face of California's strong policy preference.  As noted, various state and federal cases have ruled that California has a fundamental interest in invalidating non-compete restrictions and that § 16600 reflects strong public policy.  Some courts have found this policy to substantially outweigh the parties' expectations.  See Google, Inc. v. Microsoft Corp., 415 F. Supp. 2d 1018, 1022 (C.D. Cal. 2005) (applying California law to non-compete clause despite contract's choice of law clause designating Washington law, noting California's strong interest in protecting employees from non-competition agreements and observing that "Washington, on the other hand, expresses no such policy preference") and United Rentals, Inc. v. Pruett, 296 F. Supp. 2d 220, 231-34 (D. Conn. 2003) (using similar logic to apply California law to non-compete clause despite contract's choice of Connecticut law.)

Drawing from this line of authority, the court finds that California's § 16600 generally voiding covenants not to compete expresses a strong public policy favoring competition. California has determined that the well-being of its citizens and economy are best fostered by

strongly encouraging competition, even to the extent that it limits the generally broad right of parties to contract upon terms to which they agree.  By comparison, Washington, like Texas, is "not enthusiastic" about enforcing covenants not to compete, requiring a court to find that a covenant is reasonable before enforcing such a promise.  See Dresser, 732 F.2d at 787.  Moreover, although Washington has not limited parties' freedom to agree under the requirements established by its case law, that state has not by statute expressed a policy favoring such agreements.  Accordingly, as in Dresser, California's interest in this dispute is significantly greater than the parties' expectations.

digEcor's reliance on Hoiles v. Alioto, 461 F.3d 1224 (10th Cir. 2006) does not persuade the court otherwise.  In Hoiles, the court applied California law to a contingent fee agreement between a Colorado client and a California attorney in part because the agreement would not have been enforceable under Colorado law.  See id. at 1232.  The court noted that the "only the application of California law will preserve the parties' justified expectation that they executed a valid contingent fee agreement."  Id.  But this factor was not the sole consideration in that case.  In fact, the court in Hoiles also placed considerable weight on its belief that Colorado's interests in the matter were weaker than California's because the Colorado resident had traveled to California to solicit the attorney and the attorney performed most of the work in California.  Id.  Accordingly, in Hoiles, the parties' expectations and the interest of the state both pointed to one state: California.  In this case those two factors point to different states.

Moreover, the court has its doubts concerning digEcor and e.Digital's expectations about the continuing enforceability of the covenant not to compete.  It is apparent that little care was taken in drafting and proofreading the 2002 NDA's non-compete provision.  Also, when the

parties documented their business relationship in the October 22 Agreement, which expressly superceded all prior written and oral agreements on the same subject matter, they did not include a covenant not to compete.  One would expect that, given the importance digEcor now attaches to e.Digital's ability to compete, digEcor would have insisted that a non-compete provision be included in the October 22 Agreement, even if doing so seemed overly cautious or not technically necessary.  While the court need not, and does not, reach e.Digital's renewed argument that the October 22 Agreement voided all provisions of the 2002 NDA, this issue weighs against digEcor's argument that its reasonable expectations would be frustrated if the non-compete is not enforced.

Beyond the two factors emphasized by the parties, each of the other § 6 factors lean toward applying California law or are neutral.  In terms of the needs of the interstate system, e.Digital, the company that would be prevented from competing, is a California company. California enacted a statute specifically designed to further competition by its citizens. Meanwhile, Washington's continuing interest in this dispute appears attenuated, as digEcor has (for the most part) moved to Utah.  Moreover, Washington's interest in enforcing promises not to compete is relatively weak.  Utah, as the forum state, also has only a weak policy preference to enforce non-compete agreements, as it requires such agreements to be reasonable.  It is unclear how applying either Washington or California law would fit with the basic principles of contract or non-competition law, making this factor indeterminate.  In terms of certainty, predictability, and uniformity, it must be noted that a Washington resident reached out to a California resident here.  It is thus predictable that California law would apply.  Finally, the laws of Washington and

California are equally easy to determine and apply here.  In sum, applying Utah's choice of law analysis, the court concludes that California law applies to the 2002 NDA.[3]

**B.     Application of California Law to the 2002 NDA**

A straightforward application of § 16600 leads the court to the conclusion that Paragraphs 1, 4, 5 and 6 of the 2002 NDA are void under California law.  That section, entitled "[v]oid contracts," states that:

> Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

California Business and Professions Code § 16600.  Each of Paragraphs 1, 4, 5, and 6 of the 2002 NDA restrains e.Digital from participating in the market for airline-appropriate digital viewers, which is a lawful activity.  digEcor cites no authority suggesting that § 16600 does not apply to the 2002 NDA or to these two corporate parties.[4]  Nor does digEcor suggest that any exception to § 16600 might apply here.  Accordingly, summary judgment in favor of e.Digital and against digEcor on all claims relating to the enforceability Paragraphs 1, 4, 5 and 6 of the 2002 NDA is appropriate.

---

[3] Even if Washington law were to be applied, as digEcor urges, the prospects of enforcing the 2002 NDA's non-competition provisions as written would be dim.  Washington law requires that limits on competition be reasonable in duration and geographic scope.  See, e.g., Perry v. Moran, 748 P.2d 224, 230-31 (Wash. 1987) and Sheppard v. Blackstock Lumber Co., Inc., 540 P.2d 1373, 1376 (Wash. 1975).  The court has serious doubts that Paragraph 1, 4, 5 and 6 of the 2002 NDA, with their uncertainty, inconsistency and expansive scope, would survive a reasonableness inquiry.

[4] "While many cases applying section 16600 arise in the context of an employer-employee relationship, the statute also applies to other contracts, such as manufacture or distributorship agreements between businesses or individuals."  Jan Marini Skin Research, Inc. v. Allure Cosmetic USA, Inc., 2007 WL 1508686, *13 n.20 (Cal. App. Ct. May 24, 2007) (citations omitted) (unpublished opinion).

III.     **Alleged Breaches of the October 22 Agreement**

A.     **Provision of Functional Specifications**

Both parties seek summary judgment regarding their claims concerning the October 22 Agreement's "functional specifications" clause.  digEcor contends that this clause obligated e.Digital to provide digEcor with blueprints for the digEplayer 5500 sufficient for another OEM to produce it.  Because there is no dispute that e.Digital did not provide such blueprints, digEcor claims that summary judgment is appropriate on its claim that e.Digital breached the contract.  In response, e.Digital insists that "functional specifications" referred to a list of functions that would be available to end-users.  There is no dispute that such lists were provided to digEcor. Accordingly, e.Digital seeks a declaration that it did not breach this part of the October 22 Agreement.

As an initial matter, it should be noted that the parties selected New York law to apply to the October 22 Agreement.  (See October 22 Agreement § L, attached as Ex. 7 to digEcor's Memo. in Support.)  Under New York law, a court may consider extrinsic evidence in interpreting a contract provision if that provision is reasonably susceptible to more than one meaning.  See Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y. 2002).  Here, the October 22 Agreement does not define the term "functional specification" and the court finds that this term could reasonably be understood as either party proposes.  Because this term is ambiguous, the court will consider the undisputed evidence to interpret it.  As elaborated below, the court's review of this evidence leads to the conclusion that e.Digital has not breached this provision of the October 22 Agreement.

16

Here, the burden of proving an interpretation that would support a claim for breach falls on the party claiming breach. Absent evidence that would allow a fact finder to find in favor of the party claiming the sponsored interpretation, the court is required to grant summary judgment for the opposing party. digEcor offers no contemporaneous evidence to support a factual finding that the parties understood "functional specifications" to mean blueprints at the time of contracting. Rather, digEcor points to Mr. Boyer's after-the-fact interpretation of that term. After-the-fact statements of a party's understanding of the contract term at the time of contracting, carry little or no weight when there is no evidence that they were communicated to the opposing party in the contract negotiations. See, e.g., Haeberle v. Texas Int'l Airlines, 738 F.2d 1435, 1440 (5th Cir. 1984) ("Evidence of intent may be considered in testing the reasonableness of alternative interpretations of a writing only when there is reason to believe the intent was shared.") (Pennsylvania law). This conclusion is particularly true where the party arguing for that interpretation is seeking to impose obligations that were not clearly stated in the contract documents.

On the other hand, the context of the relationship and the language of the October 22 Agreement both support e.Digital's interpretation. Specifically, the October 22 Agreement gives digEcor ten days to accept or reject the "functional specifications." It is undisputed that digEcor had no expertise in the manufacture of viewers. It makes little sense for digEcor to contract for a right to approve blueprints that it did not have the expertise to understand. Moreover, over the course of the relationship, e.Digital provided end-user function lists to digEcor, which digEcor approved. digEcor offers no evidence that it objected or otherwise claimed this performance was incomplete until after this dispute arose. This course of dealing further suggests that the parties

understood these lists to be the "functional specifications" called for by the 2002 NDA.  On this record, no reasonable fact finder could conclude that the October 22 Agreement required e.Digital to deliver blueprints or other documents beyond those digEcor acknowledges that e.Digital delivered.

Accordingly, e.Digital is entitled to a declaration that e.Digital did not breach the October 22 Agreement's "Functional Specifications" clause.  Conversely, digEcor's motion for a finding of breach is denied.

**B.    Duty to Negotiate Revenue Sharing Agreement in Good Faith**

e.Digital maintains that digEcor was bound by the October 22 Agreement to negotiate a revenue sharing deal in good faith.  There is no indication from the record that any such negotiations took place, so if such a duty existed, a ruling that digEcor breached would be warranted.  digEcor responds that the October 22 Agreement's promise to negotiate is unenforceable under New York law.  As discussed below, digEcor is correct on this point.

Under New York law, "[l]ack of specificity renders an express duty to negotiate in good faith enforceable."  L-3 Comm'ns Corp. v. OSI Sys., Inc., No. 02 Civ. 9144(DC), 2004 WL 42276, *10 (S.D.N.Y. Jan. 8, 2004) (citations omitted) (New York law).

> Where a material term is left open for negotiation in a preliminary agreement, and there is no "indication of the parties' intent regarding that term, a provision obligating the parties to negotiate that term in good faith is a mere 'agreement to agree,' which is too indefinite to be enforced."

Id. (citation omitted).

Here, the parties agreed to the general concept that there would be some form of revenue sharing.  But there is no indication of what the parties intended the revenue sharing terms to be,

such as a framework setting out proposed ranges or guidelines.  Accordingly, the October 22

Agreement's good faith negotiation clause is unenforceable under New York law.  Summary

judgment in favor of digEcor and against e.Digital on this issue is therefore appropriate.

**IV.     Breach of Purchase Order and/or DRM Agreement**

      **A.     Li-on Batteries**

digEcor argues that e.Digital has breached the PO by not delivering any of the 1250 Li-on

batteries that digEcor paid for.  e.Digital does not deny that it failed to provide batteries to

digEcor, nor does e.Digital deny that digEcor has paid for them.  Accordingly, a summary

judgment in favor of digEcor on its claim that e.Digital is in breach of the PO by not providing

batteries is warranted.

A judgment that digEcor is entitled to the purchase price of the batteries is also

appropriate.  To the extent that digEcor also seeks consequential damages on for failure to

deliver the batteries, that claim presents a factual issue that, on this record, cannot be decided on

summary judgment.

      **B.     digEplayer 5500s**

digEcor further contends that e.Digital breached the PO by failing to deliver the

digEplayer 5500s in a timely manner.  digEcor maintains that it lost customers and suffered other

consequential damages as a result of this beach.  e.Digital responds that it delivered the viewers

as soon as it reasonably could and that, if its performance was untimely, it is excused because

Maycom's failure to deliver was out of its control.  e.Digital further argues that the DRM

Agreement's terms apply to the purchase, limiting its liability to $25,000 in any event.  Both

sides seek a summary judgment affirming their positions.

### 1.    Controlling Agreement

The first issue is what agreement governs digEcor's order of Li-on batteries and digEplayer 5500s.  e.Digital contends that the DRM Agreement governs that transaction, citing several parts of the DRM Agreement and the PO in support.  digEcor responds that the PO controls its order and that the DRM Agreement and the PO are separate agreements.  As discussed below, digEcor is correct.

The first possible way to find that the PO is governed by the DRM Agreement is to determine that the PO incorporates the DRM Agreement's terms.  Such a finding would be incorrect as a legal matter.  The PO is governed by Utah law because, among other things, the order was made by a Utah company with delivery to be made to Utah.  See Salt Lake Tribune, 390 F.3d at 693.  Under Utah law, "parties may incorporate the terms of another document by reference into their contract" but only if they use "specific language" to do so.  Housing Auth. of County of Salt Lake v. Snyder, 44 P.3d 724, 729 (Utah 2002).  The PO's only arguable reference to the DRM Agreement is the statement that the "order is contingent on reaching an agreement on DRM terms."  (PO, attached as Ex. 55 to e.Digital's Memo. in Opp'n.)  That phrase is not a sufficiently specific reference to incorporate the DRM Agreement's terms into the PO.  Consequently, the PO does not incorporate the terms of the DRM Agreement.

The second possible way to find that the DRM Agreement controls the PO is to find that the DRM Agreement incorporates the PO.  Under New York law, which governs the DRM Agreement, whether two agreements should be read together depends on the intent of the parties.  See TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2nd Cir. 2005) (New York law).  If two contracts unambiguously reflect an intent to be part of the same agreement, the

parties' intent is decided as a matter of law, while resolving ambiguity requires a factual inquiry. See id. e.Digital argues that the parties' unambiguous intent to have the DRM Agreement govern the PO is reflected in the statement that digEcor's order for the 1250 digEplayer 5500s and batteries was a "part of" the DRM Agreement. (DRM Agreement ¶ 5, attached as Ex. B to Dkt. No. 84.) The court does not agree that this language reflects a clear intent to incorporate the DRM Agreement's terms into the PO. Among other things, the same paragraph states that the first products would be "deliverable immediately." (Id.) That term directly contradicts the PO, which calls for January 10, 2006 delivery date. (See PO.) Moreover, the DRM Agreement's only clear reference to the order is contained in that paragraph.

For its part, digEcor argues that the PO was meant to serve as consideration by digEcor to induce e.Digital to enter into the DRM Agreement. Under this interpretation, "part of" refers to a separate piece of a larger transaction. This conclusion, however, is also not decisively established by the terms of the agreement. Accordingly, neither party's proposed reading of the DRM Agreement is unambiguously supported by the agreement itself.

Because of this ambiguity, the question of whether the parties intended the DRM Agreement to govern the PO is a factual question. On a motion for summary judgment, the court must find that there is sufficient evidence for the fact finder to conclude that the parties intended the PO to be controlled by the terms of the DRM Agreement. e.Digital has failed to present sufficient evidence to support such a finding. On the other hand, digEcor's representative stated that he believed that the PO was meant to be an incentive for e.Digital to enter the DRM Agreement, suggesting that at least one party to the agreements understood them to be separate. Moreover, a careful reading of the language of the DRM Agreement and the PO confirms that

21

they were meant as separate agreements.  Simply put, the DRM Agreement is most naturally read to cover the terms of a technology project.  The DRM Agreement's reference to the order as a part of the DRM Agreement appears to be an acknowledgment of that order, not an export of its terms to that order.  e.Digital has offered no evidence of the parties' intent at the time of contracting that would support a factual finding to the contrary.  Moreover, the PO's reference to reaching DRM terms as a contingency further suggests that the parties viewed them as separate agreements.  Accordingly, the court finds as a matter of law that the PO, not the DRM Agreement, governs the purchase of the 1250 digEplayer 5500s at issue here.

>    **2.      Breach of the PO for Failure to Deliver the digEplayer 5500s**

digEcor insists that it should be awarded a judgment that e.Digital breached the PO because e.Digital did not deliver the digEplayer 5500s until many months after called for by the PO.  e.Digital contends that it is excused for any late delivery by Maycom's failure.  Put simply, neither party is entitled to its requested judgment.

e.Digital is incorrect that Maycom's failure excuses e.Digital from any breach claim as a matter of law.  The question of whether delivery became commercially impracticable is one of fact.  See Leanin' Tree, Inc. v. Thiele Techs., Inc., 43 Fed. Appx. 318, 322 (10th Cir. 2002) (discussing Colorado version of UCC).  On this record, there are disputes of material fact relevant to this decision.  As but one example, a reasonable fact finder could decide that e.Digital should have moved to find a new contract manufacturer more quickly.

That e.Digital is not excused as a matter of law, however, does not mean that digEcor is automatically entitled to a finding of breach.  That is because even assuming that e.Digital was under a duty to deliver the digEplayer 5500s, there is a dispute as to the date by which they were

required to be delivered.  digEcor does not dispute that its own actions in failing to timely

provide specifications excused e.Digital from meeting the PO's listed ship date of January 10,

2006.  Moreover, neither party argues that there was any express agreement after January 10,

2006 as to what the new delivery date, if any, would be.  This state of affairs leaves it to a fact

finder to determine when delivery reasonably could be expected, if at all.

     digEcor attempts to avoid this result by arguing that the court may rule that e.Digital was

obliged to deliver the digEplayer 5500s within a specified time period after digEcor provided

those specifications based on the parties' alleged course of dealing.  But the facts concerning the

parties' previous interactions could lead a reasonable fact finder to different conclusions about

what a reasonable delivery time would have been.  Because there was no established time

window for delivery, and because the facts surrounding the delay are in dispute, digEcor is not

entitled to a ruling that e.Digital breached as a matter of law.

     In sum, digEcor is granted a judgment that e.Digital breached a contract to provide 1250

Li-on batteries and that it is entitled to a refund of the batteries' purchase price.  Consequential

damages as a result of this breach are a factual question.  In contrast, disputed questions of fact

mean that both parties are denied judgment on their claims regarding the breach of the PO for

e.Digital's delayed delivery of the digEplayer 5500s.

## V.    Related Motions

### A.    e.Digital's Motion for Continuance

     e.Digital moved to continue the court's consideration of summary judgment on its claims

of misappropriation, tortious interference, and defamation (Dkt. No. 238).  Since that time,

e.Digital has voluntarily dismissed its claim for misappropriation (see Dkt. Nos. 308 & 310).

Moreover, the parties have engaged in supplemental briefing with regard to the interference and defamation claims.  Accordingly, the motion to continue is denied as moot.

### B.      e.Digital's Concordance

digEcor's main concern with e.Digital's factual concordance is that the concordance contains arguments regarding the facts at issue that in effect allow e.Digital to ignore the page limit for reply briefs.  While this argument is well taken, the court does appreciate e.Digital's efforts to organize the facts in a manner that is helpful and easy to read.  Accordingly, the court will not strike the concordance, but has disregarded the third column, which contains e.Digital's editorial comments on the status of the factual disputes.

### ORDER

For the reasons stated above, the court ORDERS as follows;

e.Digital's motion for summary judgment (Dkt. No. 214) is GRANTED in part, DENIED in part and DEFERRED in part, as specified above;

digEcor's motion for summary judgment (Dkt. No. 217) is GRANTED in part, DENIED in part and DEFERRED in part, as specified above;

e.Digital's motion for a continuance (Dkt. No. 238) is DENIED as moot and

digEcor's motion to strike the concordance (Dkt. No. 271) is DENIED.

A hearing on the remaining issues on summary judgment and related motions will be held on March 23, 2009 at 10:00 a.m.

SO ORDERED this 13th day of March, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge